**BBS NORWALK ONE, INC., Plaintiff,**

v.

**RACCOLTA, INC. and Steven Nicholas Bunzl, Defendants.**

**No. 95 Civ. 4138(MGC).**

United States District Court,
S.D. New York.

June 23, 1999.

---

Wachtel & Masyr, LLP, New York City, by John H. Reichman, for plaintiff.

Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City by Aaron Stiefel, Davida H. Isaacs, for defendants.

### OPINION & ORDER

CEDARBAUM, District Judge.

BBS Norwalk One, Inc. ("BBS") sues Steven Nicholas Bunzl ("Nick") and Raccolta, Inc., a company wholly owned by Nick, for aiding and abetting a breach of fiduciary duty by BBS's officer, Hugo Bunzl. BBS's sole asset is an office building in Norwalk, Connecticut. BBS contends that Hugo Bunzl misappropriated

the opportunity to purchase the building's mortgage at a substantial discount. It alleges that Nick (who is Hugo's cousin) knowingly participated in Hugo's breach of fiduciary duty by lending Hugo money to make the down payment and by then purchasing the mortgage himself when Hugo failed to repay the loan.

The defendants previously moved for summary judgment on the grounds (1) that an arbitration award—which denied all claims by the other shareholders of BBS against Hugo Bunzl—collaterally estopped BBS from arguing that Hugo Bunzl breached his fiduciary duty, and (2) that defendants did not know of Hugo Bunzl's alleged breach of fiduciary duty. I granted the motion on the ground of collateral estoppel, but specifically did not reach the alternate ground. The Second Circuit reversed, holding that the defendants did not show that the arbitrator's decision necessarily involved a determination on the merits. *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674 (2d Cir.1997). Following the Second Circuit's decision, defendants renewed their motion for summary judgment on the ground that there is no genuine issue of material fact as to their lack of knowledge of Hugo Bunzl's alleged breach of fiduciary duty. In addition, plaintiff now requests leave to amend its complaint to assert a claim of unjust enrichment. For the reasons that follow, defendants' motion is granted and plaintiff's application is denied.

## UNDISPUTED FACTS

The following facts are undisputed except where otherwise noted.

BBS is a Delaware corporation which was formed in 1991 for the purpose of acquiring and operating an office building in Norwalk, Connecticut (the "Property"). (Joint Pretrial Order ¶ 1.) BBS purchased the Property subject to two mortgages of more than $10 million from Chase Manhattan Bank. (*Id.* ¶ 22.)

Ten percent of the shares of BBS were owned by John Steele. Ninety percent of the shares were owned by B & B Property, Inc. A single stock certificate, representing all of the shares of B & B, was issued in the name of Hugo Bunzl and his uncle, Virginio Battanta, as "TEN COM" (presumably meaning tenants in common).[1] (*Id.* ¶¶ 10, 12, 13.) Battanta, Hugo and Steele were directors and corporate officers of BBS. (*Id.* ¶¶ 18, 19.)

Battanta resides in Milan, Italy and visits the United States for only a few days each year. Battanta sent Hugo to the United States to monitor the investment in the Property and to report to Battanta. (*Id.* ¶¶ 14, 16, 17.) The Board of Directors of BBS did not meet between September 27, 1991 and May 31, 1994. (*Id.* ¶ 25.)

In April 1993, at the invitation of Hugo Bunzl, Nick visited the Property with Hugo and Jerome Lowell of Hall Investments, Ltd., which was the managing agent for the Property. Hugo and Lowell asked Nick if he wished to purchase an equity position in the Property. (*Id.* ¶¶ 29, 30.) In May 1993, at Nick's request, Lowell provided Nick certain financial information regarding the Property. (*Id.* ¶¶ 32, 33.)

Hugo sent a letter dated May 5, 1993 to Chase on BBS stationery and signed "Hugo Bunzl, Director." (*Id.* ¶ 31; Stiefel Aff.Ex. 22.) Hugo wrote: "Confirming our conversation we are prepared to purchase our current first mortgage together with the balance of our construction line ... for the amount of Seven Million Dollars." Hugo Bunzl sent another letter dated November 19, 1993 to Chase, again on BBS stationery and signed "Hugo Bunzl, Director": "Confirming our meeting of this day, this will confirm our offer to purchase our current mortgage and con-

---

1. As of 1996, the ownership of B & B was being litigated by Battanta and Hugo in state court.

struction loan for the sum $6,500,000." (Joint Pretrial Order ¶ 36; Stiefel Aff.Ex. 21.)

In early December 1993, Chase offered BBS the opportunity to purchase the Chase mortgages for $6.5 million. (Joint Pretrial Order ¶ 37.) On December 2, 1993, Chase's counsel (Russel Hamilton of Dewey Ballantine) sent Lyda Hakimi of Hall Investments a draft letter agreement addressed to BBS. It provided that Chase would sell the mortgages to "you or your designee" for a total purchase price of $6.6 million, to be paid at a closing to take place by March 15, 1994. BBS or its designee was required to tender a down payment of $660,000 by December 15, 1993. (*Id.* ¶ 38; Stiefel Aff.Ex. 23.) The Chase mortgages had an outstanding principal balance in excess of $9 million at that time. (Joint Pretrial Order ¶ 39.)

The draft letter agreement was telecopied to Duane Berlin on December 3, 1993. Berlin was a partner at a Norwalk, Connecticut law firm that rendered legal services to BBS beginning in early 1993 until the first half of 1995. (*Id.* ¶¶ 38, 28.)

In late 1993, Hugo and Lowell were negotiating with WestPac Capital Services, Inc. "for financing for BBS in the amount of $11.3 million for the purposes of purchasing the Chase mortgage[s] at a discount, purchasing the BBS interests of Battanta and Steele, and paying for tenant improvements. WestPac sent a proposal to Lowell dated November 29, 1993, and Hugo signed it on behalf of BBS." (Joint Pretrial Order ¶ 41; *see also* Stiefel Aff. Ex. 24.) The contemplated Westpac financing, however, apparently could not be finalized by December 15, 1993, the deadline for the Chase down payment. (Nick Bunzl Dep. at 302–03.)

On December 7, 1993, Hugo asked Nick for a loan of $660,000 for the down payment required by Chase. (Joint Pretrial Order ¶ 42.) On December 8, 1993, Nick telecopied Hugo a memorandum in which Nick stated: "On behalf of an investment company, ROMAGNA ETS c/o Lehman

Bros. N.Y. over which I have full investment power of attorney, I am prepared to make available in cash an emergency loan of $660,000 payable to Chase Manhattan Bank against their mortgage on [the Property]." (Stiefel Aff.Ex. 25.) Nick stated that as a condition of the loan, he required "a legal document from your lawyer." The terms of the loan required that Romagna be paid $1 million by February 7, 1994. In the event that repayment was not made by February 7, Romagna was to have the right "to take over ... the agreed deal with Chase to pay off the entire mortgage at the agreed amount of $6,600,000 in total." Nick further wrote that "[i]n addition, in the event of non payment, Romagna requires a guaranteed IOU from a Hugo controlled entity that is in a position to repay $1,000,000 plus interest from February 7, 1994 within a period of 12 months." Finally, Nick stated, "The simplest solution of course for all concerned is that you repay the $1,000,000 as agreed on February 7 and soon thereafter you pay everyone off as agreed and walk away with 100% of a substantially 100% rented premium property financed at an attractive fixed rate for 8 years."

On the same day (December 8, 1993), Lowell returned to Nick a copy of the memorandum signed by Hugo as "agreed and accepted." Lowell also wrote to Nick that he had asked "counsel" to prepare the necessary documents. (Stiefel Aff.Ex. 56.)

Attorney Duane Berlin prepared a set of documents, including a promissory note to be signed by Hugo in the amount of $1 million and in favor of Romagna, a guaranty of the note by BBS, and a letter agreement between BBS and Romagna which provided that in the event Hugo failed to pay the note on February 7, 1994, BBS would assign to Romagna its right to buy the mortgage. (Joint Pretrial Order ¶ 44; Stiefel Aff.Ex. 28–30.) Nick telecopied these drafts to his attorneys, Kaye, Scholer, Fierman, Hays & Handler. (Joint Pretrial Order ¶ 44.)

The documents ultimately signed include a promissory note showing an obligation running from Galaxy Realty, Inc. to Romagna for $1 million and signed by Thomas Vellotti, President of Galaxy. (*Id.* ¶ 52.) Galaxy is a corporation whose sole shareholder and sole director is Hugo. (*Id.* ¶ 47.) The other documents were a guaranty of the note from Hugo, a guaranty from BBS (signed by Hugo in an unspecified capacity) and a December 13, 1993 letter agreement among BBS (signed by Hugo in an unspecified capacity), Romagna and Galaxy. (*Id.* ¶¶ 52–55.) That letter states:

> This will further serve as an assignment by Galaxy Realty, Inc. to Romagna Ets, and a designation by Galaxy of Romagna Ets as such assignee of all of Galaxy's right, title and interest in and to that certain letter agreement between Galaxy and Chase Manhattan Bank of even date herewith and the right of Galaxy set forth therein to purchase the commercial note and mortgage executed by Galaxy in favor of Chase Manhattan Bank covering the above-referenced property in accordance with the terms set forth in said letter agreement, provided, however, that this assignment shall be null, void and of no further effect in the event that the above-referenced Promissory Note is paid in accordance with its terms.

(Stiefel Aff.Ex. 40.)

In fact, the referenced agreement with Chase was between Chase and BBS, not Chase and Galaxy. That agreement, in which Chase agreed to sell the mortgages to BBS or its designee for $6.6 million, was signed on December 14 by Hugo Bunzl. (*Id.* ¶ 56; Stiefel Aff.Ex. 41.) BBS assigned Galaxy its right to purchase the mortgages in a letter signed by Hugo as BBS's president. (Stiefel Aff.Ex. 42.) (Hugo was not BBS's president.)

In January or February 1994, Nick was aware that Micro Warehouse had recently leased two floors of the Property and that once lease payments commenced, the Property would have a net operating income of $1.9 million per year. (*Id.* ¶¶ 65, 67; Stein Aff.Ex. 2 (Nick Bunzl Dep.) at 470.)

In early February 1994, Hugo called Nick to advise that he could not repay the promissory note coming due because WestPac was still delaying the financing. At Hugo's request, Nick extended the due date by one week. (Joint Pretrial Order ¶ 61.)

In late February and early March 1994, the relationship between Battanta and Hugo Bunzl "started to go sour." (Joint Pretrial Order ¶ 71.) Battanta accused Hugo of selling an apartment in Italy and misappropriating the proceeds to which Battanta was entitled. By a letter dated March 4, 1994, Battanta advised Lowell that Hugo was not to have access to Battanta's New York apartment and, with respect to the Property, stated, "I intend manage [*sic*] myself the business." (*Id.*) By March 6, 1994, Nick had been told by Hugo and Lowell that certain differences had arisen between Hugo and Battanta regarding a matter in Italy and that Hugo had been told to vacate Battanta's apartment in New York. (*Id.* ¶ 72.) In a March 6, 1994 letter, Nick wrote to Antonio Carneglia—a Battanta associate—that "You are doubtless fully informed from my cousin Hugo that I have become involved in the unfortunate drama surrounding Hugo, Gino Battanta and . . . the office building." (Stein Aff.Ex. 31.) He went on to state that he was "most interested in purchasing the above building as a long-term investment." In that letter, Nick did not mention Hugo's failure to pay the promissory note or Nick's impending purchase of the mortgages on the Property.

Ultimately, neither Galaxy nor Hugo paid the $1 million promissory note and Nick decided to exercise Romagna's right to purchase the Chase mortgages at a discount. (Joint Pretrial Order ¶ 64.) Nick's lawyers at Kaye, Scholer and Duane Berlin drafted the necessary papers, which provided that Raccolta—a corporation controlled by Nick—would ac-

quire the Chase mortgages. Berlin provided BBS's "Certified Resolutions and Certificate of Incumbency"—signed only by Hugo in his capacity as "Assistant Secretary%"—certifying that BBS had held a Board of Directors meeting on March 10, 1994, at which the Board authorized any BBS officer to execute the closing papers. The "Certified Resolutions and Certificate of Incumbency" also certified the signature of Hugo Bunzl (but no other BBS officers) and described Hugo as holding the offices of Vice President, Treasurer and Assistant Secretary. (Stiefel Aff.Ex. 50.)

Berlin also provided an opinion letter in which he stated that "[w]e have acted as counsel to BBS ... in connection with" Raccolta's purchase of the mortgages. (Stiefel Aff.Ex. 53.) Berlin opined that the assignments of the mortgages and loan documents from Chase to Raccolta "are in proper form so as to establish title to and ownership of the Loan Documents in and to [Raccolta]." He also wrote that "we have not examined any corporate documents, records or other certificates or instruments which we would deem necessary in order to render an opinion as to whether [BBS] had the requisite Power and Authority to borrow the proceeds of the loan [from Chase] evidenced by the Loan Documents, to Perform its Obligations or to Execute and Deliver the Loan Documents and, accordingly, we express no opinion as to such matters."

The closing was held on March 15, 1994, and was attended by Chase and its attorneys (Dewey Ballantine), Nick and his attorneys (Kaye, Scholer), Hugo, Berlin (purportedly representing BBS and Galaxy) and Lowell. (Joint Pretrial Order ¶ 78.) At the time of the closing, the Chase mortgages had an outstanding principal balance of $9,184,544.09. (*Id.* ¶ 79.)

## DISCUSSION

### I. *Defendants' Motion for Summary Judgment*

A motion for summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993). Nonetheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### A. *Choice of Law*

■ Defendants argue that the law of Delaware, the state of BBS's incorporation, should govern the claim. Plaintiff contends that the law of New York, the state that it contends has the greatest interest in this litigation, should apply. Plaintiff also relies on the BBS Shareholders Agreement, which provides that "[t]his Agreement shall be governed and construed in accordance with the laws of the State of New York." (Stiefel Aff.Ex. 4 at 12.) Neither party argues for application of the law of Connecticut, which is the state where the Property is located.

■ Because this is a diversity case, New York choice-of-law rules apply. *Klaxon Co. v. Stentor Electric Mfg. Co.,*

313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, issues relating to the internal affairs of a corporation are decided in accordance with the law of the state of incorporation. *Hart v. General Motors Corp.*, 129 A.D.2d 179, 517 N.Y.S.2d 490 (1st Dep't 1987); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 645–46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."). The "internal affairs doctrine" recognizes that the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations. *Hart*, 517 N.Y.S.2d at 494. Thus, the internal affairs doctrine is really a specialized application of the New York rule—heavily relied on by plaintiff—that the law of the state with the greatest interest in the issue governs.

 Consistent with the internal affairs doctrine, a claim of breach of fiduciary duty owed to a corporation is governed by the law of the state of incorporation. *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 n. 3 (2d Cir.1980). Judge Sweet has held that a claim of aiding and abetting a breach of fiduciary duty is also governed by the law of the state of incorporation. *Lou v. Belzberg*, 728 F.Supp. 1010, 1023 (S.D.N.Y.1990) (shareholders of Ashland Oil sued a potential hostile acquirer for aiding and abetting Ashland directors' alleged breach of fiduciary duty by entering into a "greenmail" agreement); *see also Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 986 (E.D.N.Y.1988) (claim of civil conspiracy governed by law of state of incorporation: "[s]ince Delaware law will determine whether the individual defendants breached their fiduciary

obligations ...], Delaware law should determine whether third-party defendants conspired with them to assist in that breach"), *vacated in part on other grounds sub nom. In re Crazy Eddie Securities Litig.*, 714 F.Supp. 1285 (E.D.N.Y. 1989).

 Plaintiff argues that the aiding and abetting claim should be governed by New York law because, by virtue of the BBS Shareholders Agreement's choice-of-law provision, the underlying breach in this case would be governed by New York law. Under New York's conflict-of-law rules, however, a contractual choice-of-law provision does not ordinarily bind the parties as to tort claims. *Fustok v. Conticommodity Servs., Inc.*, 618 F.Supp. 1082, 1089 (S.D.N.Y.1985). The choice-of-law provision in the BBS Shareholders Agreement is narrow and does not purport to govern a tort claim. *Compare Turtur v. Rothschild Registry Intern., Inc.*, 26 F.3d 304, 309–10 (2d Cir.1994) (provision that subscription note shall be governed by New York law "without giving effect to the principles of conflict of laws" and consenting to exclusive jurisdiction of New York courts "to resolve any controversy or claim arising out of or relating to this contract or breach thereof" was "sufficiently broad" to cover tort claims arising from the contractual relationship) *with Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 611 (2d Cir.1996) (observing that a "choice of law clause, which states only that the 'Agreement is to be governed by the laws of ... New York,' does not purport to govern a claim in tort").

In any event, because the claim in this case relates fundamentally to the conduct of the internal affairs of BBS, the law of the state of incorporation—Delaware—governs.

### B. The Merits

 Under Delaware law, a claim of aiding and abetting a breach of fiduciary duty (sometimes referred to as a claim of civil conspiracy) requires: (1) the existence

of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by the non-fiduciary. *In re Santa Fe Pacific Corp. Shareholder Litig.*, 669 A.2d 59, 72 (Del. 1995). The New York law governing a claim of aiding and abetting is not materially different.[2]

Defendants assume for purposes of this motion that Hugo Bunzl breached his fiduciary duty. (Def.Mem. at 27.) The critical question is whether there is a genuine issue of material fact as to whether Nick's participation in Hugo's breach was knowing. In order to survive a summary judgment motion, BBS—the party that will bear the burden of proof at trial—must proffer evidence upon which a jury could reasonably conclude that Nick and Raccolta knowingly participated in Hugo's assumed breach of fiduciary duty.

BBS argues that Nick knew in December 1993, when he loaned the funds for the Chase down payment, that Hugo was breaching his fiduciary duty to BBS. BBS relies on the fact that the borrower was not BBS but a Hugo-controlled entity, and that Nick only mentioned BBS in his December 8, 1993 memorandum as the entity that Hugo sought to control. Moreover, argues BBS, Nick must have known that the action being taken in the name of the corporation was not authorized, because all of the related BBS documents were signed only by Hugo. BBS suggests that Nick had a stake in the breach because he would not otherwise have obtained such favorable terms for the loan (the equivalent of more than 300 percent interest per annum, or the option to buy the mortgages at a sub-

stantial discount). (Pl.Mem. at 13–14; Tr. at 28–31.)

The facts that BBS points to do not support a conclusion that Nick knew, in December 1993 when he made the loan, that Hugo was breaching his fiduciary duty. The fact that the borrower was Galaxy Realty, rather than BBS, does not reasonably support an inference that Nick knew that Hugo was attempting to steal a corporate opportunity from BBS. The loan proceeds were paid to Chase as the down payment for the mortgage purchase. BBS was represented by counsel and provided a guaranty of the underlying promissory note. Moreover, BBS was a party to the letter agreement assigning Romagna the contingent right to acquire the Chase mortgages. (Stiefel Aff.Exs. 39 & 40.)

The fact that the BBS documents were all signed by Hugo does not show that Nick knew Hugo was acting without authority. At most, BBS might be able to show that Nick should have suspected that Hugo did not possess the requisite corporate authority. However, even if BBS could make such a showing, it would be insufficient to sustain its claim. BBS cites no case holding that, in the context of liability for aiding and abetting a breach of fiduciary duty, a non-fiduciary is obligated to verify a fiduciary's authority to act on behalf of a corporation. The cases cited by BBS, *International Boiler Works Co. v. General Waterworks Corp.*, 372 A.2d 176 (Del.1977) and *Limestone Realty Co. v. Town and Country Fine Furniture & Carpeting, Inc.*, 256 A.2d 676 (Del.Ch.1969), are inapposite.[3] The issue in these con-

---

**2.** Under New York law, third party liability for participation in a breach of fiduciary duty is established by showing: (1) a breach by a fiduciary, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach. *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir.1987).

**3.** The cases cited by BBS under New York law are also inapposite. In *Herbert Construction Co. v. Continental Insurance Co.*, 931 F.2d 989 (2d Cir.1991), plaintiff beneficiary

sued an insurance company for breach of a contract signed by the insurance company's agent, who lacked actual authority to enter into the contract. In stating that a party contracting with an agent has a duty to inquire in certain circumstances, the Second Circuit explicitly indicated that this applied "[i]n the apparent authority context." *Id.* at 995–96. The question in that case had nothing to do with aiding and abetting liability. The other cases under New York law cited by BBS similarly address the issue of when a

tract cases was an agent's apparent authority and a party's duty to inquire when dealing with the agent. These cases do not shed light on the requisite knowledge standard for a claim of aiding and abetting a breach of fiduciary duty. BBS is not suing to disclaim contracts signed by Hugo on its behalf.

In any event, BBS's theory that Nick had reason to suspect in December 1993 that Hugo was acting without authorization has little evidentiary support. In addition to Hugo, Nick was dealing with Jerome Lowell (the property manager) and Duane Berlin (the attorney who had represented BBS in the past). Nick knew that Hugo had a close relationship with Battanta, and that Hugo was a major shareholder of BBS and was managing its business. Finally, Nick testified at his deposition that he understood that *BBS* required the funds to secure the deal with Chase. (Nick Bunzl Dep. at 302, 333–34.)

Moreover, the mere fact that Nick obtained a favorable deal does not reasonably support a conclusion that he knew of any wrongdoing. *See Rand v. Western Airlines, Inc.,* No. 8632, 1989 WL 104933, at *5 (Del.Ch. Sept.11, 1989); *see also Lewis v. Leaseway Transp. Corp.,* No. 8720, 1990 WL 67383, at *8 (Del.Ch. May 16, 1990) (purported breach of fiduciary duty, consisting of unfair dealing and unfair pricing in connection with a leveraged buyout, was not "inherently wrongful" and thus could not sustain an inference that the alleged aiders and abettors had acted knowingly).

BBS argues that, even if Nick did not knowingly participate in the breach in December 1993, Nick's participation in Hugo's breach became knowing in early March 1994, when Nick became aware that Hugo and Battanta were engaged in a dispute. (The closing of the mortgage acquisition did not occur until March 15, 1994.)

BBS suggests that once Nick became aware that Hugo had entered the December 1993 agreement without authority, he had a duty to offer the opportunity to purchase the mortgages to the corporation. BBS provides no legal authority for the proposition that a non-fiduciary would have such a duty under these circumstances.

Moreover, BBS does not proffer evidence that, if Nick had approached Battanta or Steele, BBS could have utilized the opportunity (i.e., raised the funds to purchase the Chase mortgages and repay Nick). BBS states, in its memorandum of law, that Battanta had contributed $5 million to BBS in the past, and that Battanta could have supplied or raised the necessary funds. (Pl.Mem. at 14–15.) This lawyer's assertion is without evidentiary support, although Battanta is available to BBS as a witness.

In order for BBS to establish that Nick's participation became knowing in March 1994, it must show that Nick knew that Hugo had entered into the December 1993 transaction in breach of his fiduciary duty. BBS fails to make such a showing. It relies on the fact that Nick knew in early March 1994 that Hugo and Battanta were involved in a dispute, and that Nick did not mention the impending mortgage purchase in a March 6, 1994 letter to Antonio Carneglia, a Battanta associate. BBS also points to the fact that Lois Gordon of Kaye, Scholer saw the BBS Shareholders Agreement prior to the closing (Stein Aff. Ex. 5 at 131–32), and that Gordon wrote the following in a March 4, 1994 memorandum to a Kaye, Scholer colleague: "Need evidence of Hugo Bunzl's signing authority including resolutions. Hugo Bunzl had

---

contracting party can rely on the apparent authority of a counterparty's agent. *See First Fidelity Bank v. Government of Antigua & Barbuda,* 877 F.2d 189 (2d Cir.1989); *C.E. Towers Co. v. Trinidad and Tobago (BWIA Int'l) Airways Corp.,* 903 F.Supp. 515 (S.D.N.Y.1995); *General Overseas Films, Ltd. v. Robin Int'l, Inc.,* 542 F.Supp. 684 (S.D.N.Y. 1982); *Collision Plan Unlimited, Inc. v. Bankers Trust Co.,* 63 N.Y.2d 827, 482 N.Y.S.2d 252, 472 N.E.2d 28 (1984).

signed some of the letters as 'director, authorized signature' but legal documents were signed by 'Virginio Battanta' as President." (Stein Aff.Ex. 30 at ¶ 8.) But evidence of Hugo's signing authority was subsequently supplied in the form of Certified Resolutions. BBS notes that the Certified Resolutions, as well as the Estoppel Certificate and the letter confirming Galaxy's designation of Raccolta as the purchaser of the mortgages, all were signed by Hugo. (Stiefel Aff.Exs. 52, 50 & 54.) These facts do not reasonably support a conclusion that Nick knew that Hugo had breached his fiduciary duty by entering into the December 1993 agreement.

BBS bears the burden of proving that defendants knowingly participated in Hugo's breach of fiduciary duty. Because BBS has not proffered evidence that reasonably supports such a finding, defendants' motion for summary judgment must be granted. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. Plaintiff's Application to Add a New Claim

■ BBS seeks to add a "claim for unjust enrichment." [4] BBS states that defendants have been unjustly enriched because "[i]t would be inequitable for the defendants to keep a $3,000,000 windfall from BBS'[s] assignment of the right to purchase the Chase mortgage, where BBS received no consideration for the transfer and the defendants knew, or at the very least, had countless reasons to suspect, that the assignment was made without the requisite corporate authority." (9/5/97 Reichman Letter.) BBS made its application approximately 18 months after the

close of discovery and more than one year after the parties submitted a joint pretrial order.[5] Defendants oppose the request on the ground that allowing the new claim would require additional discovery and thereby unduly prejudice them.

■ Leave to amend "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, the district court has discretion to deny leave to amend where the application is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant. *MacDraw, Inc. v. CIT Group Equipment Financing, Inc.,* 157 F.3d 956, 962 (2d Cir.1998).

■ Mere delay, absent a showing of bad faith or undue prejudice, does not justify denial of leave to amend. *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993). However, the longer the period of unexplained delay, the less will be required of the non-movant in showing prejudice. *Id.*

BBS asserts that neither party will need to conduct additional discovery. Defendants disagree. They argue that the issue of whether defendants were unjustly enriched turns in part on the value of the mortgages when Chase decided to sell them. Defendants argue that, at a minimum, they will have to conduct additional discovery of Chase regarding its decision to sell the mortgages at a discount and the basis for the price it set. In addition, defendants state that they probably will need to retain an expert to testify regarding the value of the mortgages (presumably both as of the time the option was

---

4. BBS's proposed new claim is better characterized as a claim for restitution based on unjust enrichment. *See* 66 Am.Jur.2d Restitution and Implied Contracts §§ 3, 4 (1973). Plaintiff does not submit a proposed amended complaint.

5. BBS originally argued unjust enrichment when appealing my initial decision on defendants' summary judgment motion. At that

point, approximately one year had passed since the parties had submitted the joint pretrial order and discovery had been closed. The Court of Appeals declined to consider BBS's argument then because it was being raised for the first time on appeal. *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 678 (2d Cir.1997).

negotiated and as of the time Nick exercised the option).

BBS denies that additional discovery of Chase will be necessary, because it is irrelevant what Chase thought the mortgages were worth. According to BBS, defendants knew the mortgages' value because they had "inside knowledge" not possessed by either Chase or the other BBS shareholders (i.e., that the building soon would be fully rented as a result of Micro Warehouse's new lease). BBS asserts that if defendants did insist upon additional discovery, such discovery would require only a "half-day deposition." (9/25/97 Reichman Letter.)

BBS acknowledges that in order to state a claim of restitution based on unjust enrichment, it must show that defendants received an unjust windfall from the transaction. (9/5/97 Reichman Letter.) While this position is implicit in BBS's complaint,[6] it is not an essential element of a claim of aiding and abetting a breach of fiduciary duty. Indeed, based on the summary judgment motion, it appears that the defense case has rested on the propositions that Nick did not knowingly participate and that Hugo did not breach his fiduciary duty. These propositions, even if proven, would not necessarily suffice in defending against BBS's proposed new claim.

Defendants thus have made a showing that in order to defend against a restitution claim, they would be required to conduct additional discovery that would place more than a *de minimus* burden on them. Because BBS did not seek to amend its complaint until more than one year after the close of discovery, the submission of the joint pretrial order and the filing of a motion for summary judgment, because BBS has not provided any explanation for the delay, and because the claim plainly could have been asserted at the time of the complaint or before discovery closed, defendants should not be required to bear the burden of conducting additional discovery to oppose the new claim at this time. *See MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 962 (2d Cir.1998). Accordingly, BBS's application is denied.

## CONCLUSION

For the foregoing reasons, defendants' renewed motion for summary judgment is granted and plaintiff's application for leave to file an amended complaint is denied.

SO ORDERED.

---

6. *See* Complaint ¶¶ 22, 23 ("At the time of the assignment, the Chase mortgages had an outstanding balance in excess of $10,000,000, yet Raccolta paid only $6,600,000 for the Chase mortgages. Since acquiring the Chase mortgages, Raccolta has continued to collect interest on the full amount of the Chase mortgages rather than the discounted amount which Raccolta paid for such mortgages.").