80 F.Supp.2d 129 (1999)
OFFICIAL COMMITTEE OF the UNSECURED CREDITORS OF COLOR TILE, INC., Plaintiff,
v.
INVESTCORP S.A., Investcorp International Inc., CIP Limited, Corporate Equity Limited, Acquisition Equity Limited, Funding Equity Limited, Planning Equity Limited, Elias N. Hallack, Nemir A. Kirdar, Michael L. Merritt, Paul W. Soldatos, Jon P. Hedley, Charles J. Philippin, E. Garrett Bewkes, III, Walter F. Loeb, Coopers & Lybrand, L.L.P., Investcorp Bank, E.C., ABF Acquisition Corp., Investcorp Holdings Limited, Window Investments Limited, Shades International Limited, Shades Investments Limited, Blinds Equity Limited, Blinds Holdings Limited, AIBC Investcorp Finance B.V., Investcorp Investment Holdings Limited, Acquisition Capital Limited, Corporate Capital Limited, Funding Capital Limited, and Planning Capital Limited, Defendants.
No. 97 CIV. 9261(MGC).
United States District Court, S.D. New York.
November 18, 1999.
*130 *131 Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City by Peter M. Fishbein, Juan C. Ordonez, Michael A. Lynn, Jane W. Parver, for Plaintiff.
Hughes Hubbard & Reed LLP, New York City by William R. Maguire, Robert J. Sisk, Claudia G. McMullin, for Defendant Coopers & Lybrand L.L.P.

OPINION
CEDARBAUM, District Judge.
The plaintiff is the Official Committee of Unsecured Creditors of Color Tile, Inc. (the "Committee") which was appointed in the 1996 bankruptcies of Color Tile, Inc. ("Color Tile") and Color Tile Holdings, Inc. ("CT Holdings"). The Committee is empowered to prosecute certain claims, including the claims in this action, on behalf of the estates of Color Tile and CT Holdings, the Unsecured Creditors' Trust, and the Consumer Deposit Trust pursuant to an Order of the United States Bankruptcy Court for the District of Delaware approving the Global Settlement Agreement dated September 17, 1997 (the "Settlement").
The Committee, standing in the shoes of Color Tile, sues Coopers & Lybrand ("Coopers") for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract in connection with a transaction that Color Tile completed in 1993 (the "1993 Transaction"). In addition, the Committee sues Coopers for negligence after the 1993 Transaction in performing the 1994 and 1995 annual audits of Color Tile's financial statements.[1]
On July 31, 1998, I granted Coopers' motion to dismiss the Amended and Consolidated Complaint against it on grounds that it alleged that all the decision-makers for Color Tile were involved in the alleged malfeasance surrounding the 1993 Transaction, and that, under New York law, their knowledge of the negative financial aspects of the 1993 Transaction was imputed to Color Tile, stripping Color Tile (and the Committee on behalf of the Color Tile estate) of standing to sue Coopers for not informing Color Tile that the 1993 Transaction would probably have negative financial results.
*132 In an effort to keep Coopers in the case, the Committee has filed the Second Amended and Consolidated Complaint (the "Complaint") which adds new allegations in paragraphs 76 through 82 that Color Tile's three management directors, who sat on Color Tile's board of directors in 1993, were ignorant of Coopers' negative conclusions about the 1993 Transaction, and that, had Coopers made full disclosure to them, the 1993 Transaction would not have been carried out. The Committee argues that the new allegations about the management directors are sufficient to prevent the imputation of the guilty knowledge of Color Tile's board of directors and controlling shareholder group from being imputed to Color Tile itself.
The Complaint is unchanged with respect to the allegations that Coopers performed the 1994 and 1995 audits negligently.
Coopers, reciting the same arguments that it made in support of its prior motion, moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim for which relief may be granted. On June 30, 1999, the parties were directed to supplement the motion papers with briefs on the issue of which state's law New York courts would choose to apply to the Committee's claims against Coopers. For the reasons that follow, Coopers' motion to dismiss is granted.

BACKGROUND
The Complaint alleges the following facts.
Until it ceased doing business, Color Tile, a Delaware corporation headquartered in Fort Worth, Texas, was the largest specialty retailer of floor covering products in North America. In 1989, Investcorp S.A. and affiliated entities and individuals referred to in the Complaint as the "Investcorp Group" acquired Color Tile. The Investcorp Group formed a holding company, CT Holdings, to hold all the common stock of Color Tile. Through CT Holdings, the Investcorp Group exercised control over the management and operations of Color Tile and had the power to vote all of the common stock of Color Tile and to elect all of the directors of Color Tile. The management of Color Tile owned nonvoting stock in CT Holdings. Entities not affiliated with the Investcorp Group owned two classes of preferred stock in Color Tile.
At least as early as 1992, the Investcorp Group began preparing for a future public equity offering for the purpose of cashing out its interest in Color Tile. In 1993, the Investcorp Group determined that in order to effectuate a satisfactory public offering, Color Tile had to increase the multiple of its earnings by acquiring a high growth company. The Investcorp Group decided that Color Tile would acquire the assets (the "ABF Assets") of American Blind Factory, Inc., a Michigan-based business that sold blinds and wallpaper. The Investcorp Group dictated the price that Color Tile paid ABF Acquisition for the ABF Assets. This purchase price was more than twice the fair value of the ABF Assets. To undertake the purchase, Color Tile was forced by the Investcorp Group to issue $200 million of Senior Notes, the proceeds of which were used to pay for the ABF Assets and to replace lower interest bank debt. "The Investcorp Group forced Color Tile to acquire the ABF Assets at a grossly inflated price and to issue $200 million of expensive junk bond debt in order to further its own objective of cashing out its investment in Color Tile despite the fact that the [1993] Transaction was detrimental to Color Tile." (Compl. ¶ 50.) "To justify the purchase of the ABF Assets and the financing, the Investcorp Group used highly unrealistic projections of Color Tile's and ABF's sales and EBITDA growth." (Id.)
The 1993 Transaction was one in which the Investcorp Group was "interested," since an Investcorp affiliate, ABF Acquisition, sold the assets to Color Tile, the *133 Investcorp Group received over $4 million in fees for arranging the 1993 Transaction, and the Investcorp Group used the 1993 Transaction to further its own exit strategy at the risk of the company's very viability and to the detriment of Color Tile's preferred stockholders.
At the time of the 1993 Transaction in December 1993, Color Tile had a five member board. Two of its directors, Paul W. Soldatos and Walter F. Loeb, were "Investcorp affiliated," because they worked for the Investcorp Group in capacities other than as Color Tile directors. The remaining three directors, however, had no interest in the Investcorp Group other than through their work as directors and managers of Color Tile (the "Management Directors"). They were the CEO, CFO, and President of Color Tile.
Beginning in 1990, Coopers served as Color Tile's financial advisor, consultant, due diligence advisor, accountant and auditor. It served in these capacities over a period of more than six years. In the course of the relationship, Coopers became intimately familiar with Color Tile's finances and financial condition, including its budgeting process and the reliability of its projections.
Coopers performed several accounting functions in connection with the 1993 Transaction. It reviewed Color Tile's operations for the nine months ended October 3, 1993, reaffirmed its audit results for Color Tile, and participated in the drafting of the prospectus and registration statement for the $200 million Senior Notes Offering. In addition, Coopers reviewed, analyzed and reported on the financial position of the target, ABF. Coopers performed the vast majority of Color Tile's due diligence of ABF; this due diligence gave Coopers knowledge about ABF and its future prospects which was superior to that of Color Tile's management. Coopers was also retained to review and report on the future performance projections of ABF, Color Tile, and the combined Color Tile-ABF entity. Because of its substantial knowledge of the operating and financial condition of both Color Tile and ABF, Coopers was in a superior position to understand and evaluate whether the projected operating results for the companies, on which the success of the 1993 Transaction relied, were reasonable and attainable.
Through its due diligence and financial accounting work, Coopers learned that the projections used to substantiate the 1993 Transaction were unrealistic and based on unreasonable assumptions. Coopers knew that, because the financial projections bore no resemblance to the actual performance of the two companies, there was a grave risk that Color Tile would be unable to meet its obligations as they became due and to operate the business in a competitive fashion after the 1993 Transaction. The Complaint refers to this knowledge as Coopers' "Negative Conclusions."
Further, Coopers "came to realize and know that the 1993 Transaction was being forced on Color Tile by the Investcorp Group for the interests of the Investcorp Group and was detrimental to the interests of Color Tile." (Id. ¶ 160.) Coopers knew that Color Tile's controlling shareholder group and Soldatos and Loeb "were breaching their fiduciary duties in forcing the 1993 Transaction upon Color Tile, which [Coopers] knew was in the Investcorp Group's interest, but was detrimental to the interests of Color Tile." (Id. ¶ 167.)
Coopers did not inform Color Tile of its Negative Conclusions. Because Coopers did not report truthfully to Color Tile, the Management Directors did not know that Coopers had reached the Negative Conclusions. Nonetheless, based on their own understanding of Color Tile's operation and growth prospects, the Management Directors "opposed the acquisition" of the ABF Assets. (Id. ¶ 44.) They believed that "the purchase price was grossly excessive" and that the financing for the 1993 Transaction, which was based on unrealistic growth projections, imposed "an imprudent *134 and unmanageable debt structure on Color Tile." (Id.)
Despite their extreme reservations, the Management Directors, together with Soldatos and Loeb, approved the 1993 Transaction through unanimous written consents. The Complaint characterizes the consent of the Management Directors as "forced":
The Investcorp Group dominated Color Tile's board of directors and forced Color Tile to consummate the [1993] Transaction. Because the Investcorp Group and the CT Holdings Controlling Shareholders owned the lion's share of Color Tile and controlled all of the shareholder votes, because the management directors relied on the Investcorp Group's false representations that Color Tile would have sufficient cash available to meet its obligations as they became due and to operate the business in a competitive fashion after the transaction, and because the management directors were full-time employees of Color Tile whose jobs were dependent on the Investcorp Group, the management directors deferred to the Investcorp Group's demand that Color Tile consummate the Transaction, even though they had advised the Investcorp Group that the purchase price was grossly excessive, the projections supporting the Transaction were unrealistic and exaggerated, and the Transaction would impose an imprudent and unmanageable debt structure on Color Tile. Since the Investcorp Group had the power to remove any member of the Color Tile board and add new members to the board at will, the management directors could not have prevented the Investcorp Group from forcing Color Tile to go ahead with the Transaction by voting against it. The Investcorp Group simply could have removed the management directors from the board and/or added sufficient additional directors who would vote for the Transaction so as to bring about board approval.
(Id. ¶ 80) (emphasis added).
It is also alleged that when the Management Directors expressed their opposition to the 1993 Transaction, the "Investcorp Group responded to such opposition by freezing Color Tile's management out of the Transaction and by handling all of the arrangements [itself]." (Id. ¶ 44.) "[T]he Investcorp Group ignored management's warnings and proceeded with the Transaction." (Id. ¶ 52.)
According to the Complaint, if Coopers had performed its 1993 duties honestly and accurately, the Management Directors would have indirectly prevented the 1993 Transaction by disclosing Coopers' Negative Conclusions to the bank group. The banks and Bear Stearns, in turn, would have derailed the acquisition by refusing to sell the notes on the basis of the falsely inflated projections or otherwise permit the 1993 Transaction to proceed.[2]
*135 In March 1994, after the 1993 Transaction had closed, Coopers audited Color Tile and gave an unqualified opinion that Color Tile's 1993 financial statements were prepared in accordance with generally accepted accounting principles and presented fairly the financial position of Color Tile as of January 2, 1994. Coopers failed to disclose that there was a substantial doubt that Color Tile had the ability to continue as a going concern and failed to value Color Tile on a liquidation basis or write down the company's approximately $270 million in goodwill.
The following year, in April 1995, after another audit, Coopers issued its report on Color Tile's 1994 financial statements. The report failed to raise any red flags about Color Tile's ability to continue as a going concern, and again failed to write off goodwill or value the company on a liquidation basis. At that time, the company "was in the midst of a full-blown liquidity crisis [and Coopers] knew that Color Tile was desperately in need of cash, and that it was unable to obtain additional financing from the Bank Group, [and] that Color Tile's cash flow was insufficient to support growth [or] cover interest, principal and dividend payments as currently scheduled." (Id. ¶ 87.)
It is alleged that, had Coopers properly qualified its opinions on the 1993 and 1994 financial statements, "Color Tile could have taken steps that would have preserved whatever value of the company was salvageable." (Id. ¶¶ 186, 190). Instead, Color Tile limped along until January 1996, when it finally recognized the depth of its financial crisis and filed for bankruptcy.

DISCUSSION

A. Choice of Law
New York courts apply an "interest analysis" to determine which state's substantive law applies to tort claims, Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 196, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985), and a "center of gravity" or "grouping of contacts" approach to determine the choice of law for contract claims. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir.), cert. denied, 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); Alonso v. Saudi Arabian Airlines Corp., 98 Civ. 7781(SAS), 1999 WL 244102, at *5 (S.D.N.Y. Apr. 23, 1999). In this case, the Committee's submissions show, and Coopers does not dispute, that Color Tile's principal place of business was in Fort Worth, Texas and that Coopers' Fort Worth, Texas office played a significant role in connection with the 1993 Transaction and performed substantially all of the auditing and certification work on Color Tile's 1993 and 1994 financial statements. Texas law thus governs the negligence, breach of fiduciary duty, and contract claims. The claim for aiding and abetting a breach of fiduciary duty, however, is governed by the law of Delaware, Color Tile's state of incorporation. BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F.Supp.2d 123, 128-29 (S.D.N.Y.1999).

B. Claims regarding the 1993 Transaction
The four claims for relief that the Committee asserts against Coopers for its involvement in the 1993 Transaction are: (1) breach of fiduciary duty; (2) aiding and abetting the Investcorp Group's breaches of fiduciary duties of care and loyalty; (3) breach of contract for failing to report to Color Tile its actual conclusions about the 1993 Transaction; and (4) alternatively, breach of contract for failing to recognize that the projections used to substantiate the 1993 Transaction were unrealistic. Coopers argues that no matter which state law governs these claims, dismissal is required because no state's law permits a company to maintain a lawsuit against its outside accounting firm for failure to disclose to the company information that was already known by every member of its *136 board of directors and every owner of its common stock.
1. Delaware Law Claim  Aiding and Abetting Breach of Fiduciary Duty. While there is little Delaware case law on point, Coopers cites a case, applying Delaware law for standing purposes, which holds that the trustee of Granite Partners L.P., a Delaware partnership, lacked standing to bring claims against third party brokers who aided and abetted Granite's insiders in their misconduct. In re Granite Partners, L.P., 194 B.R. 318, 322, 325, 328-30 (Bkrtcy.S.D.N.Y.1996); see also Primavera Familienstiftung v. Askin, 95 Civ. 8905, 1996 WL 494904, at *11-12 (S.D.N.Y. Aug.30, 1996) (discussing Granite Partners). Granite Partners expressly follows New York case law on standing to support its holding. There are no Delaware cases that have been decided contrary to New York law. Thus, it appears that there is no conflict between New York and Delaware law.
Under the New York law cited in Granite Partners, an action which consists of claims against a third party for defrauding a corporation with the cooperation of management "accrues to creditors, not to the guilty corporation." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir.1991) (the "Wagoner Rule"). Further, "[i]t is well-settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." Id. at 118 (citing Caplin v. Marine Midland Grace Trust Co. of New York, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)). Thus, under the Wagoner Rule, a bankrupt corporation's trustee or committee of unsecured creditors lacks standing to bring a claim against a third party for defrauding or misleading the corporation with the cooperation of the corporation's management.
Although Wagoner involved a sole shareholder who orchestrated the fraud, and whose conduct was thus clearly attributable to the corporation under the "sole actor" exception to the adverse interest doctrine of agency law, see Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 827 (2d Cir.1997), subsequent cases have recognized that the Wagoner rule is also applicable outside the sole actor context if "all relevant shareholders and/or decisionmakers" were involved in the wrongful conduct, Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (S.D.N.Y.1997), or if there is otherwise sufficient "unity" between the corporation and defendant to implicate the corporation itself, rather than just its agents, in the alleged wrongdoing. Lippe v. Bairnco Corp., 218 B.R. 294, 302 (S.D.N.Y.1998); Securities Investor Protection Corp. v. BDO Seidman, LLP, 49 F.Supp.2d 644, 651 (S.D.N.Y.1999).
As set forth in Wechsler, in cases involving more than one corporate actor, the plaintiff may avoid dismissal for lack of standing by alleging the existence of "an innocent member of ... management who would have been able to prevent the fraud had he known about it." Wechsler, 212 B.R. at 36; see also BDO Seidman, 49 F.Supp.2d at 651 (resting decision on the absence of any allegation in the complaint that a member of the corporation's management was innocent of the fraud and could have stopped it). In Wechsler, the trustee of Towers Financial Corporation sued Towers' law firm for its involvement in a Ponzi scheme carried out by corporate insiders. The amended complaint identified two members of the Towers board who were ignorant, despite an ongoing SEC investigation, of the accounting fraud being perpetrated at Towers. Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP, 994 F.Supp. 202, 208 (S.D.N.Y.1998). The two directors had asked about the accounting practices of Towers and were given false assurances that there were no problems. Id. The Wechsler court found that the trustee had sufficiently alleged that the two directors were innocent and unaware of Tower's wrongdoing such that *137 the other corporate agents' knowledge of the fraud was not imputed to the corporation. Id.
The Committee vigorously argues that the Management Directors were similarly innocent of the detrimental aspects of the 1993 Transaction. But as alleged in the Complaint, the Management Directors voted in favor of the 1993 Transaction, partly out of their own self-interest in keeping their jobs with the company, even though they knew that the 1993 Transaction was adverse to Color Tile's interests in that "the purchase price was grossly excessive, the projections supporting the 1993 Transaction were unrealistic and exaggerated, and the 1993 Transaction would impose an imprudent and unmanageable debt structure on Color Tile." (Compl. ¶ 80.) Thus, they were not ignorant of the wrongdoing.
The Committee also argues that the allegations that the Management Directors would have indirectly caused the 1993 Transaction to collapse by taking the accurate information to the banks renders them "innocent" and thus protects the Committee from loss of standing under the Wagoner Rule. In Federal Deposit Ins. Corp. v. Ernst & Young, 967 F.2d 166 (5th Cir.1992), an analogous case, the FDIC, as an assignee of the insolvent Western Savings Association ("Western"), made the same causation argument in a suit against a third party accountant. The Fifth Circuit rejected it, explaining:
This argument is flawed because it is not an appropriate argument for Western, or its assignee, to make. Western cannot claim it should recover from [the outside accountants] for not being rescued by a third party for something Western was already aware of and chose to ignore.
Ernst & Young, 967 F.2d at 171. The Complaint also fails to allege that the Management Directors would not have had any choice other than to turn Coopers' conclusions over to Bear Sterns and the banks. Thus, the Complaint does not allege any basis for treating the Management Directors as innocent with respect the 1993 Transaction.
Because the Complaint alleges that each of the directors on Color Tile's board of directors knew of the negative aspects of the 1993 Transaction and nevertheless approved it, and because a Delaware corporation is managed by its board of directors, Del.Code Ann. tit. 8, § 141(a) (1998), and because all the common shareholders of Color Tile are alleged to have acted as a unified group in forcing the 1993 Transaction on Color Tile, the Committee's claim against Coopers for aiding and abetting breach of fiduciary duty is dismissed for lack of standing under the Wagoner Rule. See Granite Partners, 194 B.R. at 322, 325, 328-30; Wechsler, 994 F.Supp. at 208.
2. Texas law claims  breach of fiduciary duty and breach of contract. The Fifth Circuit has held that, under Texas law, collaboration by a debtor's representatives would constitute a valid affirmative defense to the debtor's claim against a third party defendant such as Coopers but would not deprive the debtor of standing to bring the claim. In re Educators Group Health Trust, 25 F.3d 1281, 1286 (5th Cir.1994). A footnote in Educators suggests that if management collaboration with the third party defendant were established on the face of the complaint (which was not the case in Educators), dismissal of the complaint for pleading the defendant's affirmative defense would be appropriate. Id. at 1286 n. 7.
The parties are in agreement that the affirmative defense to which the Fifth Circuit refers in Educators is the equitable defense of in pari delicto. See 34 Tex. Jur.3d Equity § 31 (discussing doctrines of "unclean hands" and "in pari delicto"). The Texas law claims, which the Committee has standing to pursue, are subject to any state law defense that Coopers may have. O'Melveny & Myers v. Federal Deposit Ins. Corp., 512 U.S. 79, 83-85, 114 *138 S.Ct. 2048, 129 L.Ed.2d 67 (1994). The defense of in pari delicto "is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." Pinter v. Dahl, 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The defense, traditionally limited to situations where the plaintiff bore at least substantially equal responsibility for his injury, has been expanded by contemporary courts to cover situations "more closely analogous to those encompassed by the `unclean hands' doctrine, where the plaintiff has participated `in some of the same sort of wrongdoing' as the defendant." Id. "In the case of equal or mutual fault [between two parties] the condition of the party ... [defending] is the better one." In re Granite Partners, L.P., 194 B.R. 318, 328 (Bkrtcy.S.D.N.Y.1996) (citing Black's Law Dictionary 791 (6th ed.1990)). "The doctrine is based on two premises: courts should not mediate disputes between wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct." Id. (citing Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)).
As Coopers observes, unlike the complaint in Educators, the Complaint in this case affirmatively alleges that the entire 1993 Color Tile board of directors approved the 1993 Transaction knowing that it was based on grossly inflated and exaggerated projections of revenue growth. It also alleges that the Investcorp Group, which owned all of Color Tile's common stock and acted as a sole shareholder, forced the 1993 Transaction on Color Tile against warnings from Color Tile's management. These allegations are adequate to support a determination that the 1993 directors and the Investcorp Group bear at least substantially equal responsibility with Coopers for permitting the 1993 Transaction to go forward on the basis of inflated projections.
Texas law governs the imputation of the board's and shareholders' knowledge to the corporation. O'Melveny & Myers v. Federal Deposit Insurance Corp., 512 U.S. 79, 84-85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). It provides that where the persons dominating and controlling the corporation orchestrated the fraudulent conduct, their knowledge is imputed to the corporation as principal. Federal Deposit Insurance Corp. v. Ernst & Young, 967 F.2d 166, 171 (5th Cir.1992); Mays v. First State Bank of Keller, 247 S.W. 845, 846 (Tex.Com.App.1923); cf. Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 827 (2d Cir.1997) (discussing the "sole actor" rule under New York law); Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36, 43-45 (S.D.N.Y.1997) (same).
Thus, the Committee has pleaded the affirmative defense of in pari delicto to its claims of breach of fiduciary duty and breach of contract. Because all the facts that give rise to the defense are alleged in the Complaint, it is proper to dismiss on that ground under 12(b)(6). Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir.1989); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1277 (1990 & Supp.1999). These claims are accordingly dismissed for failure to state a claim on which relief may be granted.

C. Negligence in the 1994 and 1995 Audits
Federal Rule of Civil Procedure 8(a) requires that "[a] pleading which sets forth a claim for relief ... shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief." When stating a claim, a plaintiff "enjoy[s] all favorable inferences from facts that have been pleaded" but may not assert "conclusory statements to substitute for minimally sufficient factual allegations." Furlong v. Long Island College Hosp., 710 F.2d 922, 927 (2d Cir.1983).
The Committee's statement of its negligence claims against Coopers based on Coopers' audits and certifications of Color Tile's 1993 and 1994 financial statements *139 fails to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). The Complaint alleges that Coopers "was negligent and breached its duty of care" by failing to qualify Color Tile's financial statements, failing to value Color Tile on a liquidation basis, and failing to write down or write off Color Tile's goodwill when auditing and certifying Color Tile's 1993 and 1994 financial statements. (Compl. ¶¶ 185, 189.) However, the only allegation that Coopers' negligence proximately caused injury to Color Tile is that Color Tile "could have taken steps that would have preserved whatever value of the company was salvageable" had Coopers exercised reasonable care. (Id. ¶¶ 186, 190.) (emphasis added).
Such an allegation is plainly insufficient to show that the Committee is entitled to relief. In order to prove that Coopers' negligence proximately caused Color Tile's injury, the Committee must show that Color Tile not only "could" have taken steps to salvage itself but that it would have done so if Coopers had exercised reasonable care. The Complaint alleges no facts from which it can be inferred that Color Tile's directors would have taken such steps had Coopers performed its duties appropriately. Apart from its allegations concerning the 1993 Transaction, the Complaint delicately avoids any description of the complete composition of Color Tile's board at any time. Without even alleging that Color Tile's board included a majority of "innocent" directors who would have acted in Color Tile's interest, the Complaint fails to show that Color Tile could have taken a different course, let alone that it would have. Accordingly, the Committee's negligence claims against Coopers concerning the 1994 and 1995 audits must be dismissed. See Yucyco, Ltd. v. Republic of Slovenia, 984 F.Supp. 209, 219 (S.D.N.Y.1997) (dismissing claims pursuant to Rule 8(a) because "a mere assertion that the defendant `may' be necessary under a speculative scenario for relief is insufficient to justify its continued presence in this litigation").

CONCLUSION
For the foregoing reasons, Coopers' motion to dismiss Counts Thirteen through Eighteen for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and negligence is granted.
SO ORDERED.
NOTES
[1] The Committee also asserts claims against Color Tile's controlling shareholder group and directors; those claims are not addressed in this motion.
[2] The specific allegation is:

Even though the management directors could not have prevented the consummation of the Transaction within Color Tile, they could and would have done so by going outside the company if they had known of C & L's negative conclusions and breach of its fiduciary and contractual duties. Among other things, they would have been obligated to, and would have, informed Bear Stearns and the Bank Group of C & L's negative conclusions.
Neither Bear Stearns nor any other underwriter would have sold the notes or otherwise financed the Transaction in the face of C & L's negative conclusions. Further, Color Tile would not have obtained the Bank Group's consent to the Transaction, as was required under the Senior Credit Agreement, if these lenders had been advised of C & L's negative conclusions. Thus, the management directors, who were not nearly as knowledgeable as C & L about ABF, relied on C & L's report of its analysis and conclusions concerning the projections. They could and would have taken action which would have prevented the Transaction from taking place if C & L had informed them of the C & L negative conclusions.
(Compl. ¶¶ 81, 82.)