**Gerald K. SMITH, as Plan Trustee for an on behalf of the ESTATES OF BOSTON CHICKEN, INC., et. al, Plaintiff,**

v.

**Arthur ANDERSEN L.L.P., et. al, Defendant.**

**Nos. 01–CIV–218–PHX–PGR, 01–CV–246.**

United States District Court, D. Arizona.

Dec. 6, 2001.

cation of the *Excel Homes* case.

Leo R Beus, Inc., Beus Gilbert PLLC, Phoenix, AZ, for Gerald K Smith.

Philip Scott Beck, James B Heaton, Bartlit Beck Herman Palenchar & Scott, Chicago, IL, Robert E B Allen, Charles Steven Price, Allen Price & Padden PLC, Phoenix, AZ, Joseph C Smith, Alison G Wheeler, Jennifer E Heisinger, Bartlit Beck Herman Palenchar & Scott, Denver, CO, for Arthur Andersen LLP.

John J Hebert, Hebert Schenk & Johnsen PC, Phoenix, AZ, Robert E B Allen, Charles Steven Price, Allen Price & Padden PLC, Phoenix, AZ, Charles I Poret, Dechert Price & Rhoads, New York, NY, Robert A Baime, Dechert Price & Rhoads, Boston, MA, for Scott A Beck.

Ronald L Marmer, John Koch, David M Feinberg, Jenner & Block LLC, Chicago, IL, Robert E B Allen, Charles Steven Price, Allen Price & Padden PLC, Phoenix, AZ, for Saad J Nadhair.

Dana C MacGrath, Martin Glenn, O'Melveny & Myers LLP, New York, NY, Robert E B Allen, Charles Steven Price, Allen Price & Padden PLC, Phoenix, AZ, for Mark W Stephens.

Martin Richard Galbut, Paul Allen Conant, Galbut Hunter & Conant PC, Phoenix, AZ, Robert E B Allen, Charles Steven Price, Allen Price & Padden PLC, Phoenix, AZ, George B Curtis, Gregory J Kerwin, Gibson Dunn & Crutcher LLP, Denver, CO, for Merrill Lynch & Co. Inc., Merrill Lynch, Pierce, Fenner & Smith,

Inc., Deutsche Banc Securities, Inc., Morgan Stanley & Co., Inc.

## ORDER

ROSENBLATT, District Judge.

Pending before this Court are (1) defendant Arthur Andersen's Motion to Dismiss Counts VIII, IX, X, XI and XII (Doc. 44) of plaintiff's Complaint; (2) defendant Deutsche Banc Securities/Alex Brown's, (hereinafter Alex Brown) Motion to Dismiss Counts XVIII and XIX (Doc. 51) of the Complaint; (3) all defendants' Motion to Dismiss (Doc. 56) Counts I, II, III, IV, VIII, IX, X, XI, XIV, XV, XVI and XVII of the Complaint on statute of limitations grounds; (4) defendants Beck, Nadhir and Stephens (hereinafter the Individual Defendants) Motion to Dismiss (Doc. 58) Counts I, II, III, IV, V, VI, and VII of the Complaint; (5) defendants' Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith, and Morgan Stanley & Company's (hereinafter the Underwriter Defendants) Motion to Dismiss Counts XIV, XV, XVI, and XVII (Doc. 57) and; (6) defendant Bell, Boyd & Lloyd's Motion to Dismiss Counts I and II.

### *PROCEDURAL HISTORY*

On October 5, 1998, Boston Chicken filed for protection under 11 U.S.C. § 1101, *et seq.*

On August 17, 2001, the Complaint of Gerald Smith, Plan Trustee was filed on behalf of the Estates of Boston Chicken, BC Real Estate Investments and all Boston Chicken Affiliates (hereinafter collectively referred to as Boston Chicken, unless otherwise noted).[1] The Complaint names the following individuals and entities as defendants; Arthur Andersen, Scott Beck, Saad Nadhir, Mark Stephens, Merrill Lynch & Co., Merrill Lynch,

Pierce. Fenner & Smith, Deutsche Banc Securities, Inc. d/b/a Deutsche Banc, Alex Brown and Morgan Stanley & Company. The 132 page Complaint asserts nineteen Counts against the aforementioned defendants. The Counts are alleged as follows:

1. Count I—breach of fiduciary duty, as against the Individual Defendants;

2. Count II—aiding and abetting breach of fiduciary duty, as against the Individual Defendants;

3. Count III—acting in concert, as against the Individual Defendants;

4. Count IV—negligent misrepresentation, as against the Individual Defendants;

5. Count V—fraudulent transfer/fraudulent conveyance, as against Nadhir and Beck;

6. Count VI—fraudulent transfer as against Nadhir and Beck;

7. Count VII—preferential transfer, as against Nadhir and Beck;

8. Count VIII—aiding and abetting breach of fiduciary duty, as against Arthur Andersen;

9. Count IX—acting in concert, as against Arthur Andersen;

10. Count X—professional malpractice/negligence, as against Arthur Andersen;

11. Count XI—negligent misrepresentation, as against Arthur Andersen;

12. Count XII—breach of contract, as against Arthur Andersen;

13. Count XII—preferential transfer, as against Arthur Andersen;

14. Count XIV—aiding and abetting breach of fiduciary duty, as against the Underwriter Defendants;

---

1. As Plan Trustee, Smith is empowered to commence this action on behalf of Boston Chicken pursuant to Articles IV.B and IV.J of Boston Chicken's Third Amended Plan, filed on May 3, 2000 and confirmed on May 15, 2000.

15. Count—XV—acting in concert, as against the Underwriter Defendants;

16. Count XVI—negligence, as against, the Underwriter Defendants;

17. Count XVII—negligent misrepresentation, as against the Underwriter Defendants

18. Count XVIII—fraudulent transfer/fraudulent concealment as against Alex Brown;

19. Count XIX—preferential transfer, as against Alex Brown.

In general, the Complaint alleges that each of the Individual Defendants were officers and/or directors of Boston Chicken who, by virtue of their high-ranking positions and equity positions in Boston Chicken, were capable of influencing and did influence the corporate governance of Boston Chicken, including certain affiliated companies. The Complaint alleges that with the substantial assistance of the Professional Defendants, each of the Individual Defendants breached their fiduciary duties of care, loyalty and candor to Boston Chicken by, among other things, distorting the true financial condition of Boston Chicken and by making material misrepresentations to, and/or concealing material information from, Boston Chicken's shareholders, outside directors, the Securities and Exchange Commission (SEC), creditors and the general public. The Complaint alleges that all defendants created a plan and scheme to create the illusion of growth and prosperity and to conceal their own mismanagement and misconduct.

Pursuant to Federal Rule of Civil Procedure 12(b), defendants have filed several Motions to Dismiss various Counts of the Complaint.

### FACTUAL BACKGROUND

Boston Chicken started as a rotisserie-chicken chain in Newton, Massachusetts in 1985. The first Boston Chicken store was opened in Newtonville, Massachusetts by Stephen Kolow and Arthur Cores. Kolow and Cores sold their rights to the recipe, name, and concept to George Naddaff, who opened 33 Boston area restaurants.

In transactions from late 1991 to early 1992, Naddaff sold his interest in the business to a group of investors led by Beck and Nadhir. Beck became Boston Chicken's Chairman and Chief Executive Officer. Nadhir became Boston Chicken's Vice Chairman.

Upon acquiring their interests in Boston Chicken, the Individual Defendants relied on the Area Developers to saturate certain geographically defined markets with Boston Chicken stores and (beginning in 1995) Boston Market stores. As of December 28, 1997, the Boston Chicken system included 1,166 stores located in 38 states and the District of Columbia, 847 of which were owned by Area Developers financed in part by Boston Chicken, 307 of which were owned by Boston Chicken or its subsidiaries, and 12 of which were owned by other franchisees.

The Complaint alleges that the majority of the Area Developers' financing came directly from Boston Chicken in the form of hundreds of millions of dollars in loans. Area Developers financed by Boston Chicken were referred to as financed area developers (hereinafter FADs). Boston Chicken's loan agreements with the Area Developers gave Boston Chicken the right to convert the loans to a controlling equity interest in the FADs. The Individual Defendants planned to exercise an option to take the majority control of each FAD in the event that it became profitable, thus ensuring that only the profitable entities would be reflected in Boston Chicken's financial statements.

The Complaint further alleges that the FADs were set up as separate entities, but in actuality they were always controlled by Boston Chicken. The FAD system creat-

ed the "illusion" of escalating earnings by enabling Boston Chicken to conceal the massive franchise store losses by reflecting them on the financial statements of the FADs and not on the financial statements of Boston Chicken. As the FADs were purportedly organized as private companies, the financial condition of the FADs were not publically disclosed.

The Complaint alleges that in order to fairly present Boston Chicken's financial condition, the results of the Area Developers, including the FADs, should, at all times, have been consolidated with Boston Chicken's reported financial results, or, at a minimum, disclosed in Boston Chicken's SEC filings. This failure to disclose also permitted Boston Chicken to artificially inflate their share price and enabled it to raise the cash necessary to sustain the FADs despite their ongoing losses.

More specifically, the FAD system was designed by the Individual Defendants among other things: (a) to remove from Boston Chicken's consolidated financial results the stores owned by the FADs, since these entities were not technically subsidiaries for Boston Chicken, meaning that the enormous losses these entities were incurring would not be reflected in Boston Chicken's reported financial results; (b) to reacquire the franchises if and when they became profitable, thus improving earnings without having to ever show the losses occurring during the start-up phase; (c) to conceal the operating losses of the FADs to create the false impression that Boston Chicken's store operations were successful and profitable and that Boston Chicken's prospects were extremely favorable as the expansion was leading to better and better earnings; (d) to report fictitious franchise fees from the FADs, the source of the money being provided to the franchisees by Boston Chicken itself, which allowed the individual Defendants to overstate and inflate Boston Chicken's report-

ed revenues and earnings; (e) to represent that the Boston Market "concept" was successful and was capable of continuing its huge growth; and (f) to raise more than $800 million from the sale of securities to the public, allowing Boston Chicken to loan more and more money to the FADs to increase its apparent growth rate even more.

Boston Chicken claims that they made convertible and non-convertible loans to its FADs to partially finance store development and working capital needs. Boston Chicken also provided to certain FADs various equipment and real estate leasing programs. These loan agreements provided for a revolving loan, with advances permitted during a two or three year draw period, or additional draw period in the event of a loan amendment, in a predetermined maximum amount equal to three to four times the amount of the FADs contributed capital.

Apparently, the loans were typically convertible into a majority of equity interest in the FADs after the expiration of a moratorium period, provided that the FAD had completed not less than 80% of its area development commitment, or in the event of certain loan defaults.

These loans were convertible at a conversion price set forth in the loan agreement, which price was at a premium over the per-unit price paid by investors in the FADs for their equity investments.

In addition, the Area Developers, including the FADs, were then required to pay a development fee of $5,000.00 per store in addition to a $35,000.00 franchise fee required by the franchise agreement. The Area Developers, including the FADs, were also subject to a 5% royalty on net revenue (gross revenue minus sales/service taxes, customer refunds and coupons, and the portion of employee meals not charged to the employee), a 2% national advertising

fund contribution, a 4 % local advertising fund contribution and a $10,000.00 grand opening expenditure. These percentage payments paid to Boston Chicken by the Area Developers and the FADs were recorded as revenue on Boston Chicken's income statement. These royalties, franchise related fees and interest income from the Area Developers and the FADs comprised the substantial portion of Boston Chicken's revenues each year.

However, the Complaint alleges that the royalties, franchise related fees, and interest income were omitted from any public disclosures. All of these monies, paid by the FADs, were substantially financed by loans to the FADs from Boston Chicken itself. Simply stated, it was never disclosed that Boston Chicken's revenues were being paid out of the proceeds of loans Boston Chicken made to the FADs.

The Complaint claims that, because Boston Chicken was lending money to substantially all of the FADs, most of whom experienced operating losses every year, such lending should have been carefully analyzed to determine what portion of Boston Chicken's outstanding receivables would not be collected at any given time in the future. This analysis is important to Boston Chicken because it directly affected the generation of Boston Chicken's revenues. If the Area Developers, including the FADs, failed to pay, Boston Chicken's revenues would be reduced.

Boston Chicken's largest asset was the notes receivable from the financing provided to the FADs. Despite the ever increasing and ongoing losses being suffered by the FADs, which greatly compromised the FADs' ability to pay on the notes receivable, the Individual Defendants included the notes receivable as assets on Boston Chicken's balance sheet but failed to establish, prior to the fourth quarter of 1997, an allowance for loan losses for these notes and failed to disclose the material risk that several of the FADs might be unable to continue paying on the notes.

The Complaint asserts that historically, Boston Chicken's allowance for loan losses was zero. The Individual Defendants made absolutely no provision for known or probable loan losses on notes receivable from the FADs from 1992 through 1996. By its very nature, Boston Chicken acted as a bank, and as such, required an allowance for loan losses sufficient to absorb losses inherent in the notes receivable from the FADs. This was particularly important given that the FADs were being financed by Boston Chicken and Boston Chicken's revenues were dependant on the FADs repaying the loans made by Boston Chicken. The Complaint further alleges that even with outstanding receivables to the FADs in the hundreds of millions of dollars prior to 1997, the allowance for loan losses was grossly understated by hundreds of millions of dollars.

By the end of 1997, Boston Chicken had outstanding loans aggregating nearly one billion dollars to 14 of its FADs. The FADs, however, were experiencing net losses every year and were incapable of repaying their loans to Boston Chicken. A $128 million allowance was established in 1997. However, this amount was far too small in view of the FADs' disastrous financial condition and their inability to repay the loans from Boston Chicken. This resulted in Boston Chicken's major asset being materially overstated by hundreds of millions of dollars.

On October 30, 1997, Boston Chicken announced that it was converting its loans to its 14 FADs to a majority ownership interest (The FAD Roll–Up). As a result, Boston Chicken could no longer report revenue generated from franchise royalties, franchise fees and interest as income in its financial statements. Rather it was now required to include in its financial

statements the substantial operating losses being suffered by its Area Developers, including the FADs. Indeed, Boston Chicken reported over $45 million in Area Developer losses in its December 28, 1997 financial statements, an amount in itself materially understated and not previously disclosed in Boston Chicken's income statements.

After the decision to Roll–Up the FADs was made, Boston Chicken's business strategy shifted from a franchise-based operation to a company owned store-based operation. The losses being suffered by the Area Developers and the FADs were revealed because once the losses were properly consolidated with and included in Boston Chicken's overall financial results, the Individual Defendants could no longer conceal them.

Within months after the Roll–Up of the Area Developers and the FADs, Boston Chicken was forced to file for bankruptcy because it could no longer raise the capital necessary to support the losses sustained by the FADs.

Consistent with the above factual background, the Complaint alleges that the Individual Defendants knew, based upon their business sophistication, experience, and knowledge of accounting, that Boston Chicken's financial statements were false and misleading. For example, a loan loss reserve was required, but was not taken against the substantial loans made to the FADs because the loans were impaired; and Boston Chicken's reported revenues, being largely the result of loans made to the FADs and recycled back to Boston Chicken, were fictitious. The Complaint also alleges that the Individual Defendants knew the financial statements audited by Arthur Andersen were false and misleading. Apparently, these false and misleading financial statements enabled Boston Chicken to raise hundreds of millions of dollars of debt and equity capital from the investing public.

The Individual Defendants concealed Boston Chicken's true financial condition and results of operations by failing to disclose the control Boston Chicken had over the FADs; the FADs' inability to report their notes to Boston Chicken; Boston Chicken's inability to generate any real revenue in the absence of recycled revenue flowing back to Boston Chicken from the FADs; and that third-party FAD investors could not and/or would not provide sufficient equity capital to cover the mounting FAD losses. It is for these reasons, that the Complaint alleges that the Individual Defendants further breached their fiduciary duties to Boston Chicken.

Merrill Lynch acted as co-lead underwriter for each of Boston Chicken's public offerings and shelf registrations. Throughout Merrill Lynch's involvement as Boston Chicken's lead underwriter the relationship with Boston Chicken was supervised by Charles Lewis, a Managing Director at Merrill Lynch who had a long-standing friendship and business relationship with Individual Defendant Beck. At the time of Boston Chicken's initial public offering. Lewis and his wife were substantial stockholders of Boston Chicken, owning 362,022 shares of Boston Chicken common stock and having an economic interest in an additional 199,507 shares pursuant to the ownership of limited partnership units of BC Midwest LP. After Boston Chicken's initial public offering, Lewis and his wife held as many as 961,467 shares of Boston Chicken common stock.

Alex Brown acted as co-lead underwriter for Boston Chicken's November 8, 1993 initial public offering, the January 25, 1994 4–1/2% Covertible Subordinated Debenture Offering, the August 10, 1994 Common Stock Offering, the December 5, 1995 Common Stock Offering and the April 22,

1997 7–3/4% Convertible Subordinated Debenture Offering.

Morgan Stanley acted as co-lead underwriter for the April 22, 1997 7–3/4% Convertible Subordinated Debenture Offering.

Arthur Andersen performed professional accounting services with respect to certain Boston Chicken public offerings. Arthur Andersen consented to act, and in fact did act, as the expert in accounting and auditing for Boston Chicken's November 8, 1993 initial public offering; the January 25, 1994 4–1/2% Convertible Subordinated Debenture Offering; the June 13, 1994 Acquisition Shelf Offering; the August 10, 1994 Common Stock Offering; the May 24, 1995 Lyon Offering; the December 5, 1995 Common Stock Offering; the March 5, 1996 Acquisition Shelf Offering; the April 22, 1997 7–3/4 Covertible Subordinated Debenture Offering; and the July 23, 1997 Acquisition Shelf/Resale Shelf Offering.

In connection with the foregoing offerings, Arthur Andersen consented to the inclusion of its audit opinion in the respective registration statements and to its designation as experts in accounting and auditing. As such, Arthur Andersen was required by generally accepted auditing standards (GAAS) to read the forepart of the registration statements and prospectuses to identify anything contained therein which contradicted the financial and other information contained in the audited financial statements and accompanying footnotes.

Accordingly, the Complaint alleges that beginning at various times, each of the Professional Defendants acted in concert with the Individual Defendants to increase Boston Chicken's insolvency by falsely and unlawfully misrepresenting the true financial condition of Boston Chicken, while at the same time concealing the Individual Defendants' misconduct and breaches of fiduciary duty. In so doing, the Profes-

sional Defendants assisted the Individual Defendants in maintaining the facade of growth and solvency while allowing Boston Chicken to become more and more insolvent over time as the Company was increasingly encumbered with obligations, including publically issued notes, that could not be repaid.

Among other things, the misstatement and concealment of Boston Chicken's true financial condition, and the Professional Defendants' assistance in obtaining capital from the public securities market, provided the Individual Defendants with the capital necessary to perpetuate their misconduct and drive the company deeper into insolvency. The public offerings further provided the Individual Defendants with capital that the Professional Defendants knew would be "loaned" to the FADs and "recycled" back to Boston Chicken in the form of royalties, fees and interest. Allegedly, the Professional Defendants knew that the recycled funds would then be improperly recognized as revenues by the Individual Defendants.

In the case of Boston Chicken's debt offerings, the Professional Defendants affirmatively assisted the Individual Defendants in encumbering Boston Chicken with hundreds of millions of dollars in debt that the Professional Defendants knew, or should have known, could not be repaid.

This illusion of growth was further assisted by the Underwriter Defendants insofar as they promoted the illusion of growth and prosperity by preparing analyst reports which repeatedly championed Boston Chicken to the public, usually by relying on financial and business information which the Underwriter Defendants knew, or should have known, was false.

On October 22, 1993, the SEC provided Boston Chicken with its comment letter concerning the Registration Statement for Boston Chicken's Initial Public Offering

(IPO). Among other things, the SEC specifically requested that Boston Chicken "disclose income or loss from operations for Area Developers." Merrill Lynch, Alex Brown and Arthur Andersen received the SEC's comment letter and directed, reviewed and assisted the Company's response, which was submitted to the SEC by Boston Chicken's general outside counsel, defendant Bell, Boyd & Lloyd.

The response to the SEC, dated October 26, 1993, represented to the SEC that Boston Chicken had elected to disclose only "certain selected, aggregate financial information of certain of its area developers [FADs] to assist the reader in evaluating the quality of the Notes Receivable." Even though it was recognized in the foregoing statement that the financial performance of the FADs to Boston Chicken was directly related to the collectability of the Notes Receivable due from the FADs to Boston Chicken, the response letter further stated to the SEC that "the Company believes the requested disclosure of income or loss for area developers' operations does not benefit the reader because the Company does not have any control over the operating activities or results of the area developers, all of which are independently-run businesses."

However, the Complaint alleges that the Underwriter Defendants and the Professional Defendants knew or should have known that the FADs were controlled by Boston Chicken and their financial condition was clearly material to Boston Chicken and its future business prospects because virtually all of Boston Chicken's a revenue was dependant on payments from the FADs. The only information that Merrill Lynch, Alex Brown and Arthur Andersen chose to disclose in the IPO Prospectus regarding the FADs' financial condition was limited to "selected financial information" that purposely gave the impression that the FADs were growing and profitable enterprises, when in fact, they were not. For example, the section of the Prospectus entitled "Selected Consolidated Financial And Store Data" discloses system-wide store revenues of over $100 million, but does not references anything regarding the losses by the FADs, the "recycling" of the proceeds of the Boston Chicken loans back to Boston Chicken in the form of fees, interest, and royalty payments, or the inability of Boston Chicken to collect the outstanding Notes Receivable owed by the FADs to Boston Chicken.

Apparently, this type of "non-disclosure" continued throughout several other types of offerings. Specifically, the Complaint asserts the "non-disclosure" occurred during the IPO of 1993, the 4–1/2% Convertible Debenture Offering, the Common Stock Offering of August 10, 1994, the Liquid Yield Option Notes (LYON) of 1995, the December 5, 1995 Common Stock Offering and, the 1997 Debenture Offering. Basically, the role of the FADs and the true financial condition of Boston Chicken was either not provided or, when provided, misrepresented. Typically when such offerings were made, the Professional Defendants would limit the disclosure of financial information to the "selected financial information", discussed above; this gave the improper impression that the FADs were growing and profitable enterprises, when in fact, they were not.

Moreover, in various published articles, the Professional Defendants assisted the Individual Defendants in quelling criticisms of Boston Chicken's reported revenue and "aggressive" accounting practices. Specifically, On August 12, 1994, an article was published by *USA Today* that raised questions relating to Boston Chicken's reported revenue, net income and cash flow as well as the lack of reserve for the loans to the FADs.

On the same day the *USA Today* article came out, both Merrill Lynch and Alex Brown published reports to discredit the *USA Today* article and dispel concerns relating to issues raised therein. They specifically refuted the contention that Boston Chicken was recycling capital from the FAD's and supported Andersen's failure to establish a loan loss reserve. Similarly, Peter Oakes of Merrill Lynch affirmatively misrepresented the Company's income and recognition reserves for bad debt were "reasonable and in-line with existing industry practice." Further, Merrill Lynch misrepresented that "there has been no need for a reserve" and the Company's prospects do not presently warrant a reserve."

On November 14, 1995, during the registration for the 1995 Stock Offering, Mayer, Brown & Platt, counsel to Merrill Lynch and Alex Brown, received a copy of an anonymous letter addressed to the SEC. Before the public offering of Boston Chicken's common stock could occur, a registration statement had to be reviewed and declared effective by the SEC. The anonymous letter raised questions and presented criticisms about the existence, or extent of, disclosures made, or which should be made, in the registration statement believed to be under review by the SEC. Further, this letter attached financial statements from one of Boston Chicken's Area Developers reflecting losses of over $2.8 million for 1993 and over $4.9 million for 1994.

Despite receipt of this letter, the parties involved continued on with the 1995 Stock Offering without making any additional precautionary disclosures in the Prospectus. Rather, as with the other offerings, Merrill Lynch, Alex Brown and Arthur Andersen agreed not to disclose any unfavorable information regarding the financial condition of the FADs.

This anonymous letter prompted the SEC to initiate and conduct an investigation into the financial reporting made by Boston Chicken in its public filings and registration statements. Accordingly, on January 24, 1996, Boston Chicken was informed by the SEC that the SEC was conducting an informal investigation of Boston Chicken, which Boston Chicken referred to as "Project X."

On January 25, 1996, Boston Chicken, at the direction and request of the Individual Defendants, retained Arthur Andersen to represent Boston Chicken in the Project X investigation. The scope of Arthur Andersen's representation included advising Boston Chicken about its financial disclosure obligations in its future SEC required filings.

The Complaint asserts, that as a result of the relationship between Arthur Andersen and Boston Chicken, Arthur Andersen became a fiduciary and owed Boston Chicken fiduciary duties. The Complaint alleges that in conjunction with the fiduciary relationship, Arthur Andersen committed primary violations of these fiduciary duties and/or secondary violations thereof as an aider and abettor in representing Boston Chicken in the Project X investigation.[2]

2. The Complaint notes that Arthur Andersen was Boston Chicken's accountant and each of the FADs accountants since mid–1992, thus alleging that Andersen was fully knowledgeable about the business, financial and accounting affairs of Boston Chicken and each of the FADs, as well as the interrelationship between Boston Chicken and the FADs. The Complaint alleges that Arthur Andersen utilized such knowledge in preparing the response to the Project X investigation, for example, Arthur Andersen was allegedly aware that Boston Chicken had loaned the FADs a total of $411,410,000.00 dollars as of December 31, 1995.

On February 8, 1996, the SEC met with Arthur Andersen and officers of Boston Chicken. The Complaint alleges that Arthur Andersen knew that Boston Chicken's financial accounting practices did not comply with generally accepted accounting principles, but they represented otherwise to the SEC. This resulted in the non-disclosure of information that would have revealed that the FADs were experiencing "unfavorable operating losses." Furthermore, the Individual Defendants knew, but concealed from the SEC the financial recycling relationship between the FADs and Boston Chicken.

On March 28, 1996, another SEC meeting was held. Arthur Andersen submitted Boston Chicken's newly amended revenue recognition policy to the SEC. In doing so, it is alleged that Arthur Andersen intended to perpetuate the false impression with the SEC that Boston Chicken was not recycling revenue from the FADs.

On April 11, 1996, the SEC requested further specific accounting information from Boston Chicken. On May 3, 1996, a response was prepared by the Individual Defendants and reviewed by Arthur Andersen. In general, the response addressed the issues of "recycled revenue" and the FAD loan impairment. Allegedly, the "recycled revenue" section was intended to show that the FAD loans were not being utilized to pay Boston Chicken franchise and software fees. The FAD loan impairment section claimed that the FAD loans were not impaired because the collateral value of the FADs exceeded their outstanding loans to Boston Chicken. Throughout the Project X investigation, the Individual Defendants and Arthur Andersen resisted the SEC's efforts to provide quarterly financial information concerning the FADs. They argued that providing quarterly financial information about the FADs would be unduly confusing to the public, and that only aggregate FAD losses and other limited information should be publically disclosed.

Based on the faulty representations made by the Professional Defendants to the SEC, the SEC declared the registration statement for the 1997 Debenture Offering effective, resulting in Boston Chicken being encumbered with an additional $287 million in debt. The registration statement for the 1997 Debenture Offering misrepresented and/or omitted several material facts which, if disclosed, could have prevented Boston Chicken from incurring $287 million in debt that could not be repaid and the consequent deepening of Boston Chicken's insolvency.

Overall, Boston Chicken's allowance for loan losses on Notes Receivable from the Area Developers was zero from 1992 through 1996. By the end of 1997, Boston Chicken had outstanding loans aggregating nearly one billion dollars to 14 of its Area Developers. By December 28, 1997, the 1997 fiscal year end, the company determined that all the Area Developer loans might be impaired and therefore established a newly created allowance for loan losses in the amount of $128 million. Despite this knowledge, Arthur Andersen signed unqualified audit certifications for Boston Chicken's financial statements, even when they showed absolutely no allowance for loan losses from the period 1992 through and including 1996.

Additionally, on January 30, 1997, at a Special Meeting of the Board of Directors for Boston Chicken, the Board approved the formation of Progressive Food Concepts, Inc. (PFCI). Individual Defendants Nadhir and Beck became substantial stockholders in PFCI on the day it was formed and funded with a loan from Boston Chicken. The articulated purpose for Boston Chicken's investment in PFCI was to break in to the "ready to eat" and "heat and eat" market.

When PFCI failed to turn a profit, the Board of Directors for Boston Chicken approved the acquisition of 83% of both Nadhir and Beck's stock (4,000 shares each) at a price of $4,180,480.00 apiece. The purchase price consisted of $1,000,000.00 apiece in cash and a promissory notes to each of them in the amount of $3,181,480.00 (the PFCI Notes). Subsequently, Boston Chicken received an option to acquire each of Nadhir and Beck's remaining 333.335 shares. On November 7, 1997, Boston Chicken exercised its option to acquire Nadhir and Beck's remaining shares by paying (1) $345,147.17 apiece ($1,000 per share plus 8% interest from January 31, 1997) and (2) a 50% prepayment of each of the PFCI Notes, i.e. $1,590,740 apiece. All told, including the funds paid to Nadhir and Beck, Boston Chicken lost or paid out well over $10,000,000.00 with no assets returned on which any creditors could realize in relation to the PFCI formation.

In 1998, Nadhir resigned as the Chief Executive Officer and Co–Chairman of the Board of Directors of Boston Chicken. In accordance with his resignation, Nadhir entered into a consulting agreement on May 1, 1998. Pursuant to this agreement, Nadhir was to be paid consulting fees equal to $400,000.00 per year, payable in equal biweekly installments throughout the term. The Complaint alleges that Nadhir received six such payments under the Consulting Agreement, totaling $100,000.00

Subsequent to filing the bankruptcy petition, but before the Complaint in this action was filed, Alex Brown also received substantial sums in monetary payments. Three of the payments were purportedly made pursuant to a fee agreement dated July 15, 1998. On October 2, 1998 a payment of $550,000.00 was made by wire transfer, purportedly made pursuant to a letter agreement dated September 28, 1998. This payment was an alleged initial payment towards a "restructuring fee" of $5,355,000.00. However, the Complaint asserts that the alleged restructuring referred to in the September 28, 1998 letter was never consummated.

### DISCUSSION

In analyzing a motion to dismiss for failure to state. a claim upon which relief may be granted, all allegations of material fact in the plaintiff's complaint are taken as true and construed in the light most favorable to the nonmoving party. *See National Wildlife Federation v. Espy*, 45 F.3d 1337, 1340 (9th Cir.1995); *see also Levine v. Diamanthuset, Inc.* 950 F.2d 1478, 1482 (9th Cir.1991), *rev'd on other grounds*, 950 F.2d 1478.

Dismissal of an action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is "proper only where it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**A. Motion to Dismiss, by All Defendants of Counts I, II, III, IV, VIII, IX, X, XI, XIV, XV, XVI and XVII of the Complaint in their entirety based on statute of limitations grounds**

As indicated above, there are numerous pending Motions to Dismiss the various Counts on several grounds. However, as a threshold matter, this Court must first address the "Motion of All Defendants" to dismiss the aforementioned Counts based on statute of limitations.

Defendants move to dismiss the aiding and abetting, breach of fiduciary duty, acting in concert, negligent representation and other negligence counts (collectively the "Tort Counts") on the grounds that all are barred in their entirety by the two-

year statute of limitations in Ariz.Rev.Stat. § 12–542.

Defendants claim that debtor Boston Chicken possessed knowledge sufficient to trigger the statute of limitations on the Tort Counts no later than March of 1996. Thus, they claim, that the limitations period for the Torts Counts expired in March of 1998, over six months before Boston Chicken filed for bankruptcy. The Defendants further argue that the Tort Counts expired before the bankruptcy petition was filed and thus, they are not entitled to the two-year extension of limitations period covered by 11 U.S.C. § 108(a).[3]

Should this court determine that certain limitations periods for the Tort Claims extended past Boston Chicken's bankruptcy filing of October 5, 1998, defendants argue that Plan Trustee may not claim the benefit of § 108(a) since he only achieved his representative capacity upon confirmation for the Third Amended Plan of Reorganization.

### 1. Choice of law

Trustee argues that Colorado law should govern. Using Colorado law would require this Court to apply a three year statute of limitations to the breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims. Col.Rev.Stat. § 13–80–101(1)(f); *see also Polk v. Hergert Land & Cattle*, 5 P.3d 402, 405 (Colo.App. 2000). On the other hand, under Arizona law, those claims are subject to a two-year statute of limitations. *See CDT, Inc. v. Addison, Roberts & Ludwig*, 198 Ariz. 173, 7 P.3d 979, 981 (Ariz.App.2000). Both Arizona and Colorado law establish a two-year limitations period for the remainder of the Tort Counts asserted in this action. Ariz.Rev.Stat. § 12–542; Colo.Rev.Stat. § 13–80–102.

The application of either Arizona or Colorado law turns on this Court's interpretation of Restatement (Second) of Conflict of Laws § 142 (revised 1988):

> Whether a claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6. In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) The forum will apply its own statute of limitations barring the claim.
>
> (2) The forum will apply its own statute of limitations permitting the claim unless:
>
> (a) maintenance of the claim would serve no substantial interest of the forum; and
>
> (b) limitations of a state having a more significant relationship to the parties and the occurrence.

The general rule stated by § 142 is very clear: as a starting point, the forum's statute of limitations applies. *See DeLoach v. Alfred*, 192 Ariz. 28, 30, 960 P.2d 628 (1998). If there exists exceptional circumstances, or if the two factors mentioned in § 142(2) are present, it would require the application of Colorado's longer statute.

Trustee makes no argument that exceptional circumstances would apply. Instead, Trustee relies on the significant relationship factor set forth in § 142(2); reasoning that Boston Chicken had its headquarters in Colorado and most, if not all, of the transactions complained of stem

---

**3.** 11 U.S.C. § 108(a) provides, "[i]f applicable nonbankruptcy law, an order entered in a non-bankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief."

from conduct more significantly related to Colorado than Arizona.

This Court is persuaded that the connection to Colorado is more significant than Arizona. While the matter was filed in Arizona, the majority of the conduct occurred in, or is related to Colorado. Restatement (Second) Conflict of Law § 6 cmt. e. (Where the state of the forum has no interest in the case apart from the fact that it is the place of the trial. Here only relevant policies of the state of the forum will be embodied in its rule relating to trial administration).

Accordingly, for the purposes of determining dismissal based on statute of limitations, this Court will apply Colorado law.

### 2. Accrual of the statute of limitations

Because the filing of a bankruptcy case often brings a new party, the trustee, into the affairs of the debtor, the Bankruptcy Code provides special time limitations for the trustee to take action that the debtor could have taken under nonbankruptcy law. 11 U.S.C. § 108; *see also Collier on Bankruptcy* § 108.01 (15th ed.1996). Generally, § 108(a) gives the trustee at least two years from the date of the order for relief to commence an action the debtor could have brought on the petition date.

Specifically, § 108(a) provides:

If applicable nonbankruptcy law, an order entered in an nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of -

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

In the instant action, the "order for relief", voluntary bankruptcy petition, was entered on October 5, 1998. Thus, Trustee argues that § 108(a)(2) permits the assertion of the Torts Counts for two years from the filing of the bankruptcy petition, October 5, 2000. This Court notes, that the Complaint was filed in this action on February 5, 2001 but the Complaint indicates that the parties had a separate tolling agreement which further extended the filing date to February 5, 2001.

■ Typically, in Colorado, a cause of action for negligence must be filed within two years after the cause of action accrues or in the case of breach of fiduciary duty and aiding and abetting breach of fiduciary duty, a three year limitation is permitted. Colo.Rev.Stat. § 13–80–101(1)(f). However, Colorado subscribes to the general discovery rule, which renders the statute of limitations somewhat flexible.

Under the discovery rule, a cause of action shall be considered to accrue on the date both injury and its causes are known or should have been known by the exercise of reasonable diligence. Colo.Rev.Stat. § 13–80–108(1). In other words, the limitations period does not commence until a party is put "on notice of the nature, extent and cause of injury." *Salazar v. American Sterilizer*, 5 P.3d 357, 363 (Colo. App.2000) (a claim for relief does not accrue until the plaintiff knows, or should know, in the exercise of reasonable diligence, all material facts essential to show the elements of that cause of action).

■ Trustee persuasively argues that a cause of action is tolled if the defendant affirmatively misleads or conceals the cause of action from the plaintiff. *Piper Aircraft*, 744 P.2d at 1200. This Court's review of the Complaint reveals that it pleads with sufficient particularity the fraudulent concealment of the Trustee's claims until well beyond October 5, 1996.

Specifically, the Complaint points to Arthur Andersen's assurances to the Outside Directors and Audit Committee that Boston Chicken was stable financially. There were several blatant attempts at concealing the financial condition of Boston Chicken to the SEC during the course of its investigation and the general public by the dissemination of various business articles.

The Complaint makes a *prima facie* showing that the outside Directors and Audit Committee were unaware of the "nature, extent and cause" of Boston Chicken's true financial condition until bankruptcy proceedings were initiated.

On the other hand, defendants argue that there were substantial "red-flags" to put the relevant parties on notice. The most compelling of which is the SEC investigation. Clearly, continued SEC investigations, the anonymous letter to the SEC, news reports and analyst reports may have triggered the knowledge requirement.

However, who knew what, when it became known, and what triggered such knowledge, is a question of fact under these circumstances. In this case, the Trustee claims fraudulent concealment; the defendants claim knowledge. Accordingly, because this Court is obligated to review the matter in the light most favorable to the nonmoving party and because rendering a decision as to the accrual date of the statute of limitations would require a factual determination by this Court, the Motion by all defendants to dismiss this matter on statute of limitations grounds is denied.

### B. Arthur Anderson's Motion to Dismiss Counts VIII, IX, X, XI and XII

As a threshold matter, the parties agree that Colorado substantive law should apply to Counts VIII, IX, X, XI, XII.

### 1. Dismissal for lack of subject matter jurisdiction-Fed.R.Civ.P. 12(b)(6).

■ Arthur Andersen argues that Counts VIII, IX, X, XI, XII should be dismissed for lack of subject matter jurisdiction because the Trustee lacks standing to bring this action under the doctrine of *in pari delicto*.

■ The doctrine of *in pari delicto* dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them. *See Bushner v. Bushner*, 134 Colo. 509, 307 P.2d 204 (1957); *see also Abernethy v. Wright*, 27 Colo.App. 239, 148 P. 277 (1915); Black's Law Dictionary 711 (rev. 5th ed.1979) (in pari delicto defined as "in equal fault" or "equally culpable or criminal"); *Apostolou v. Fisher*, 188 B.R. 958 (N.D.Ill.1995) (since debtor corporation did not sustain injury as victim of fraud but was injured only because it participated in pari delicto in fraudulent scheme, corporation's trustee could not recover against third party for damage to creditors).

■ The doctrine of *in pari delicto* contains one significant exception.

Although a corporation is generally not chargeable with the knowledge of its officer or director concerning a transaction in which the officer or director is acting in his own behalf the corporation will be charged with the agent's knowledge where any action taken by the agent would benefit both the agent and the corporation, the interests of the individual officer or director being clearly aligned with those of the corporation. Moreover, the exception to the general rule of imputed notice to a corporation that arises where an officer, director,

agent or employee is acting fraudulently or adversely to the corporation is not triggered where the individual is also acting for the principal's benefit even though the agent's primary interest is inimical to that of the principal. [K]nowledge *will not be imputed to the corporation on the basis of an assertion that its agents, though motivated by personal interests did benefit the corporation, where, under the facts, there is no actual benefit to the corporation.*

18B Am.Jur.2d *Corporations* § 1681 (1995) (emphasis added).

■ Arthur Andersen also relies on the *"Wagoner"* Rule, which holds that a bankrupt corporation's trustee lacks standing to bring a claim against a third party for defrauding or misleading the corporation with the cooperation of the corporation's management. *See Shearson Lehman Hutton v. Wagoner*, 944 F.2d 114, 120 (2nd Cir.1991). Trustee argues that the *Wagoner* Rule only applies to sole shareholder situations.

Although, *Wagoner* involved a sole shareholder who orchestrated the fraud, and whose conduct was thus clearly attributable to the corporation, under the "sole actor" exception to the "adverse interest doctrine" of agency law subsequent cases have recognized that the *Wagoner* rule is also applicable outside the sole actor context if "all relevant shareholders and/or decisionmakers" were involved in the wrongful conduct, or if there is otherwise sufficient "unity" between the corporation and defendant to implicate the corporation itself, rather than just its agents. *See In re Mediators*, 105 F.3d 822, 827 (2nd Cir. 1997); *see Lippe v. Bairnco Corp.*, 218 B.R. 294, 302 (S.D.N.Y.1998); *Securities Investor Protection Corp. v. BDO Seidman, LLP*, 49 F.Supp.2d 644, 651 (S.D.N.Y.).

■ In this case, the *Wagoner* rule and *in pari delicto* doctrine do not apply. As set forth in *Wechsler*, cases involving more than one corporate actor, the plaintiff may avoid dismissal for lack of standing by alleging the existence of "an innocent member...of management who would have been able to prevent the fraud had he known about it." *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, 212 B.R. 34, 44–45 (S.D.N.Y.1997).

The central issue for this Court to determine is whether the defendants were acting for themselves or for the corporation of Boston Chicken. *See Sender*, 952 P.2d at 782 (Court imputed illegal act to corporation because the corporation benefitted from the illegal acts); *see also Stat–Tech*, 905 F.Supp. at 1422 (no imputation because the wrongdoers acted adversely to the corporation).

Arthur Andersen suggests the Individual Defendants were acting in pursuit of the company's business plan, and does not allege the wrongdoing was exclusively in pursuit of their own financial gain. Thus, because the individuals' wrongful conduct was in pursuit of a business plan the alleged wrongdoing has to be imputed to the debtor, in whose shoes the Trustee now stands.

Trustee alleges that the conduct was adverse to Boston Chicken, "such conduct benefitted the individual defendant's in their individual capacities, but was *completely and directly adverse to the interests of BCI.*" (Emphasis added). Where, as is alleged here, the Complaint alleges a far-reaching scheme to continue a company in business past its point of insolvency and systematically looting it, it cannot be said that such conduct benefitted the corporation. *See Stat–Tech*, 905 F.Supp. at 1422.

I [Colorado District Court] agree with the Seventh Circuit's conclusion in *Schacht*[ *v. Brown*, 711 F.2d 1343 (7th Cir.1983) ] that to accept a rule that

precludes a corporation from recovering damages resulting from the hiding or creation of misinformation concerning its insolvency would be to create 'perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible.'
id. at 1423.

Moreover, whether or not the intent of the Individual Defendants was to exclusively benefit themselves personally or if their aim was fulfillment of a business plan, is not for this Court to decide; that is a factual issue. All this Court need be concerned with at this time is whether the Trustee made a sufficient showing that the conduct of the defendants adversely affected Boston Chicken.

Moreover, to avoid dismissal pursuant to *Wagoner,* Trustee has adequately alleged that there were innocent members on Boston Chicken's Board and Audit Committee who were unaware of the wrongdoing. *Wechsler,* 212 B.R. 34, 44–45. While discovery may reveal that the alleged "innocent members" had some limited knowledge of the wrongdoing, the Trustee's allegations are sufficient to survive this Motion to Dismiss based on lack of standing. At this time, for this Court to determine which members possessed sufficient knowledge, when it was obtained, and what they did with such knowledge would require this Court to make improper factual determinations.

### 2. *Failure to state claim*

■ Additionally, Arthur Andersen claims that Counts VIII through XI should be dismissed under Rule 12(b)(6) for failure to allege causation.

■ Causation is an essential element of the tort claims asserted against Arthur Andersen. *See Holmes v. Young,* 885 P.2d 305, 308 (Colo.App.1994) (aiding and abetting breach of fiduciary duty); *Jet*

*Courier Service, Inc. v. Mulei,* 771 P.2d 486, 502 (Colo.1989) (conspiracy); *Casebolt v. Cowan,* 829 P.2d 352, 356 (Colo.1992) (negligence); *Mehaffy, Rider, Windholz & Wilson v. Central Bank of Denver,* 892 P.2d 230, 238 (Colo.1995) (negligent misrepresentation).

Arthur Andersen contends that the Trustee's Complaint merely alleges what steps the Audit Committee and/or Boston Chicken's creditors *could* have done, when the law requires allegations of what *would* have been done to stop the misconduct. To support this argument, Arthur Andersen relies on *Official Committee of Unsecured Creditors of Color Tile v. Investcorp S.A.,* 80 F.Supp.2d 129 (S.D.N.Y.1999).

In *Color Tile,* the Unsecured Creditors Committee sued an accounting firm for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract in connection with performing annual audits of debtor's financial statements. *See Color Tile,* 80 F.Supp.2d at 131. The Court held that "the only allegation that Coopers' [defendants'] negligence proximately caused injury to Color Tile is that Color Tile "*could* have taken steps that would have preserved whatever value of the company was salvageable." " *See id.* at 139. The Court unequivocally stated, "[s]uch an allegation is plainly insufficient" to show entitlement to relief. *Id.* The Court further held that in order to prove proximate cause, Color Tile must show not only that they "*could* have taken steps to salvage itself, but that they *would* have done so." *Id.* (emphasis in original).

In any event, the Complaint clearly states, "[h]ad the Individual Defendants and Professional defendants properly discharged their duties...the Board of Directors, the Audit Committee and/or Boston Chicken's creditors *could* have taken steps to prevent [Boston Chicken] from

suffering additional harm." (emphasis added).

*Color Tile,* is distinguishable from this case in that the "innocent directors" of Color Tile voted in favor of a highly speculative acquisition "partly out of their own self interest in keeping there jobs with the company, even though they knew that the transaction was adverse to Color Tiles interest." *Color Tile,* 80 F.Supp.2d at 137. In *Color Tile,* all directors knew that the purchase price was grossly excessive, the projections supporting the transaction were unrealistic and exaggerated, and the transaction would impose an imprudent an unmanageable debt structure on Color Tile. *Id.* at 137.

Unlike *Color Tile,* the Trustee in these proceedings alleged that there were innocent members on the Boston Chicken's Board and Audit Committee who were unaware of the misconduct and could have taken action against Arthur Andersen and others. To determine whether or they actually *would* have taken action and what type of action was necessary, is a question that can only be answered after some discovery has taken place, but not at this preliminary stage.

### C. Alex Brown/Deutche Banc, Motion to Dismiss Counts XVIII and XIX

#### 1. *Count XVIII—fraudulent transfer*

■ Deutche Banc/ Alex Brown (hereinafter Alex Brown) move to dismiss Count XVIII, fraudulent transfer and fraudulent concealment, for failure to plead fraud with the specificity required by Fed. R.Civ.P. 9(b).

■ "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). While the purpose of Rule 9(b) is to provide detailed notice of the circumstances constituting fraud, each and every alleged misrepresentation need not appear in the pleadings. 2 *Moore's Federal Practice* § 9.03[1][a]. A claimant is only required to set forth the major misrepresentations or omissions upon which the fraud claims are based. A claimant is not required to explain the legal theory of the fraud claim. *See Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993).

■ The requirements of particularity under Rule 9(b) vary with each case. *See Shushany v. Allwaste,* 992 F.2d 517, 521 (5th Cir.1993). A more liberal standard for pleading fraud with particularity is applied in bankruptcy cases. *See In re O.P.M. Leasing Services,* 35 B.R. 854, 862 (Bkrtcy. S.D.N.Y.1983), *rev'd in part on other grounds, In re O.P.M. Leasing Services,* 48 B.R. 824, (S.D.N.Y.1985). This less stringent standard is predicated upon the fact that it is often the trustee, a third party, who is pleading fraud based on second-hand information. *See id.; see also Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2nd Cir.1974); *In re Germain,* 144 F.Supp. 678, 683 (S.D.Cal.1956).

■ Moreover, less particularity is required where plaintiff is not asserting that the fraud was against himself personally, but rather it was committed against a third party. *See O.P.M,* 35 B.R. at 862; *see also Allegaert v. Perot,* 78 F.R.D. 427, 430 (S.D.N.Y.1978).

Given the normal 9(b) requirements and applying the more liberal standard permitted in bankruptcy matters, it is apparent that the Trustee's Complaint satisfies Rule 9(b).

In the 130 page Complaint, Trustee has (1) identified the transfers at issue; (2) identified the relevant parties; (3) alleged Boston Chicken received less than the reasonably equivalent value in exchange for

the transfers; and (4) alleged that Boston Chicken was insolvent on the date the transfers were made. *See General Electric Capital Corp. v. Lease Resolution Corporation,* 128 F.3d 1074, 1080 (7th Cir. 1997) (Rule 9(b) satisfied when plaintiff alleged a transfer of assets, without receipt of reasonably equivalent value, which rendered the transferee insolvent); *see also In re O.P.M. Leasing,* 35 B.R. at 862 (Rule 9(b) satisfied when the trustee alleges fraudulent conveyances between certain years for a total sum certain and that these transactions occurred without the provision of fair consideration).

### 2. *Count XIX—preferential transfer*

■ Alex Brown seeks to dismiss the preferential transfer Count, arguing that the payments at issue do not relate to an antecedent debt as required by law.

■ A debtor may ordinarily prefer one or more of its creditors, so long as the transfer or payment is to pay or secure a legitimate debt and does not violate a statute. *See In re George Rodman, Inc.,* 792 F.2d 125, 127 (10th Cir.1986). However 11 U.S.C. § 547(b) of the bankruptcy code, permits a trustee to avoid certain prebankruptcy transfers as "preferences." 5 *Collier on Bankruptcy* § 547.01.

■ Section 547(b) sets forth the elements of an avoidable preference:

(1) any transfer of an interest of the debtor in property;

(2) to or for the benefit of a creditor;

(3) for or on account of an *antecedent* debt owed by the debtor

(4) made while the debtor was insolvent;

(5) made (A)...within 90 days before bankruptcy; or (B) between 90 days and one year before bankruptcy, if the transferee was an insider at the time of the transfer; and

(6) that enables the creditor to receive more than it would receive if (A) the case were a case under Chapter 7 of the Code, (B) the transfer had not been made, and (C) the creditor received payment of its debt to the extent provided by the Code.

11 U.S.C. § 547. (emphasis added). An antecedent debt is defined as a debt which is incurred prior to the relevant transfer. *See In re Intercontinental Publications,* 131 B.R. 544, 549 (Bankr.D.Conn.1991); *see also In re Artha Management, Inc.,* 174 B.R. 671, 677 (Bkrtcy.S.D.N.Y.1994).

Alex Brown acted as co-lead underwriter with Merrill Lynch in all but one of Boston Chicken's public offerings, and also acted as Boston Chicken's financial advisor in connection with each of these offerings. In mid–1998, Boston Chicken's new management hired Alex Brown specifically to provide financial services in connection with renegotiating Boston Chicken's current debt. Shortly thereafter, Alex Brown allegedly reported to the Board that it had made no progress in the attempted refinancing of Boston Chicken's massive debt. The Complaint alleges that Alex Brown received four substantial payments within 90 days of Boston Chicken's bankruptcy filing as payment for the failed refinancing (October 5, 1998, $150,000.00; September 11, 1998, $164,00.86; September 28, 1998, $165,080.36; and October 2, 1998, $550,000). These payments were an "initial payment" towards a fee of $5,355,000.00, for "restructuring" that, the Complaint alleges, was never consummated.

Alex Brown disputes that the transfer was made "for or on account of an antecedent debt." He argues that the first three transfers were payments related to services rendered contemporaneously with the payments. As such, the payments were made on accounts of current, not antecedent, debts and are not subject to avoidance as preferences. With respect to the last payment, the restructuring fee, Alex Brown argues that it was a payment

for future services which were never performed. Thus, it should be considered a payment on account of a future, not antecedent, debt.

This Court's review of the Complaint establishes that the Trustee has made the requisite *prima facie* showing that the payments made to Alex Brown were antecedent.

### D. Individual Defendants Motion to Dismiss Counts I–VII

The Individual Defendants move to dismiss Counts I–IV arguing that these Counts are barred by the statute of limitations, the Trustee lacks standing, and the Trustee does not allege facts sufficient to overcome the protection for business judgment. Additionally, the Individual Defendants argue dismissal of Counts V–VII for failure to plead fraud with particularity and because the preferential transfers were not for antecedent debts.

#### 1. Statute of limitations

In order to prevent duplication, the parties are referred to the section A(2) of this Order for a thorough discussion on this issue.

#### 2. Standing

 The Individual Defendants argue that the Trustee lacks standing to sue because a bankruptcy trustee does not have standing to pursue claims on behalf of the debtor when the creditors are the real party in interest.

In support of their argument they rely primarily on *Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir.1988). In *Williams,* the Trustee received authority to solicit and accept from investors assignments of their claims. *See id.* at 664. The Trustee then filed suit on behalf of the estate and the investors. *See id.* at 665.

A Motion to Dismiss was filed arguing that the Trustee had no standing to bring the claim of the investors. *See id.* The district court denied the motion, concluding that a Trustee may bring claims of third party creditors where there was an actual assignment approved by the bankruptcy court. *See id.*

Subsequently, the Ninth Circuit, relying on *Caplin v. Marine Midland Grace Trust Co.,*[ 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) ] held that the Trustee in *Williams* lacked authority to bring the claims despite assignment. *See Williams,* 859 F.2d at 667. The Appellate Court reasoned that there was nothing in the statutory framework of the bankruptcy code that permitted a Trustee to "collect money not owed to the estate." *Id.*

The holdings in *Williams* and *Caplin* do not, however, apply to the facts and law governing this matter. In this case, the Trustee is attempting to recover funds owed to the estate, not money owed to a creditor. Further there are no allegations, either in the Complaint or the moving papers, that any creditors or investors assigned any rights to the Trustee.

Contrary to what the Individual Defendants seem to imply through their selective representation of case law, the Trustee is charged with administering the estate of Boston Chicken. Recovering monies wrongfully disbursed, pursuing professional negligence and breach of contract claims is most certainly the obligation of, and the purpose of, the appointment of a Trustee. 11 U.S.C. § 323. Thus, it is abundantly clear to this Court, that the Trustee has standing to bring these allegations against the Individual Defendants.

#### 3. Business judgment[4]

 The business judgment rule acts to protect from liability directors of a cor-

---

4. The Court notes the Trustee and Individual Defendants dispute which law should be ap-

poration acting in good faith. *See Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo.App.2000); *see also Wolf v. Rose Hill Cemetery Ass'n*, 914 P.2d 468 (Colo.App. 1995); *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995); *see also Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.Supr.1985). Obviously, to be protected under the business judgment doctrine it must be determined that the parties acted in good faith. *See Amoco Oil Co.*, 908 P.2d 493.

■ The determination of good faith is a question of fact that is to be decided on a case-by-case basis. *See Polk*, 5 P.3d at 405; *see also Amoco Oil Co.*, 908 P.2d at 493; *Resolution Trust Corp. v. Heiserman*, 839 F.Supp. 1457, 1463 (D.Colo.1993) (a ruling on the applicability of the business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss); *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162, 174 (N.D.Ill.1990) (dismissal especially inappropriate here, where the propriety of the Board's actions will be determined under the business judgment rule).

■ The essential determination of whether the Individual Defendants acted in "good faith", is a question of fact that cannot be decided in the context of a motion to dismiss.

### 4. *Failure to plead fraud with particularity*

In the interest of judicial economy and given the substantial similarity between the arguments of Alex Brown and the Individual Defendants, the parties are referred to section C(1) of this Order for a more thorough analysis on this issue.

### 5. *Antecedent debt*

■ The parties are referred to the legal analysis previously provided in this Order in section C(2) addressing the preferential transfer allegations. However, the following will set forth the relevant facts related to Beck and Nadhir as to the preferential transfers.

On January 30, 1997, the Board of Directors for Boston Chicken approved the formation of Progressive Food Concepts (PFCI), a corporation in which Beck and Nadhir became owners by investing approximately $8,000,000.00. The purpose of PFCI was to enter the "ready to eat" market via a concept developed by Harry's Farmers Market (HFMI). To fund PFCI, the Board approved a $17,000,000.00 million convertible secured loan to the new company.

On January 31, 1997, PFCI consummated a transaction agreement with HFMI, wherein PFCI lent $12,000,000.00 to HFMI. PFCI also committed to loan an additional $8,000,000.00 to HFMI, which was later reduced to $5,500,000.00. In return, PFCI received all of HFMI's technology and received a consulting contract with HFMI.

PFCI incurred substantial operating losses. Nonetheless, the Board approved the payment of more than $8,000,000.00 (their investment plus interest) to Beck and Nadhir for their shares in PFCI. Beck and Nadhir each received $1,000,000.00 in cash and a promissory note to each of them in the amount of $3,181,480.00, even though their PFCI stock had no market value. Several months later, the Board purchased Beck and Nadhir's remaining shares in PFCI, by paying each of them $345,147.17 plus a 50% repayment of each

---

plied; Colorado or Delaware. Trustee persuasively argues that the Colorado Supreme Court, in interpreting the Restatement (Second) Conflict of Law § 309 (1971), has determined that where the corporation's primary base of operation is Colorado, the laws of the state of incorporation do not apply.

of their PFCI notes, representing an additional $15,590,740.00. Beck and Nadhir were subsequently paid at least one more interest payment on the PFCI notes in the amount of $38,199.85.

After the filing of the Boston Chicken Chapter 11 bankruptcy case and by mutual agreement, Boston Chicken terminated the agreements they had with HFMI. As a result of that settlement, as well as the funds paid to Nadhir and Beck, Boston Chicken lost in excess of $10,000,000.00 on the PFCI transaction, and had no assets resulting on which creditors could realize.

The Complaint also alleges that upon PFCI's formation, Nadhir resigned as an officer of Boston Chicken and became CFO of PFCI. Apparently, in connection with his participation in PFCI, Nadhir built a house in southern California at a cost of over $2,500,000.00. Upon rejoining Boston Chicken and selling his interest in PFCI, Nadhir was reimbursed for expenses associated with his move including the loss on the sale of his southern California house. As a result of this arrangement, Nadhir received over $1,200,000.00 from Boston Chicken.

Finally, the Complaint alleges that after Nadhir's resignation as Boston Chicken's CFO and Co-chairman of the Board, he entered into a consulting agreement with Boston Chicken. Pursuant to this agreement, Nadhir was to receive $400,000.00 per year in consulting fees. Nadhir received six payments totaling approximately $100,000.00.

The Complaint alleges, millions of dollars were transferred to the Individual Defendants, without Boston Chicken receiving a reasonably equivalent value in exchange for these transfers, at a time when Boston Chicken was insolvent. The Complaint further makes a *prima facie* showing that such transfers were payments on an antecedent debt owed by Boston Chicken, made while insolvent, and

enabled Beck and Nadhir to receive more than they would normally have received if the transfers had not been made.

### E. Underwriter Defendants' Motion to Dismiss Counts XIV, XV, XVI and XVII

The Underwriter Defendants seek dismissal of Counts XIV, XV and XVII on the basis of standing, judicial estoppel and failure to state a claim.

#### 1. Standing

The Underwriter Defendants' arguments related to standing rely on the *in pari delicto* doctrine as argued by Arthur Andersen and the *Williams* and *Caplin* cases as argued by the Individual Defendants. As the Court has fully discussed these issues above, the parties are referred to sections B(1) and D(2), respectively, for the Courts analysis.

#### 2. Judicial estoppel

■ The Underwriter Defendants reiterate in their Motion to Dismiss, the argument of judicial estoppel as asserted in the Motion to Dismiss by "All Defendants", based on statute of limitations.

■ The doctrine of judicial estoppel prevents a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an inconsistent position at a later time. *See Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir.1997).

The defendants attempt to take arguments made in support of a motion to dismiss in defense of a class action lawsuit in 1997 and use them against the Trustee in this matter. However, the defendants fail to recognize that the Trustee was not involved in making the arguments contained in the 1997 Motion to Dismiss. In 1997, the Individual Defendants were a

**1206**

persuasive influence in the Company and the Trustee argues that the arguments made were conceived in an effort to cover-up the misconduct of the defendants.

Additionally, the Court notes the Underwriter Defendants' reliance on Ninth Circuit precedent for judicial estoppel, while arguing for the application of Colorado (10th Circuit) law in all other respects. The Trustee aptly points out that Ninth Circuit law should not apply under these circumstances, as the *In re BCI* matter was filed in Colorado, the Tenth Circuit.

■ The Tenth Circuit outright rejects the doctrine of judicial estoppel. *See United States v. 49.01 Acres of Land More or Less,* 802 F.2d 387, 390 (10th Cir.1986); *see also Parkinson v. California Co.,* 233 F.2d 432 (10th Cir.1956) (reasoning that the adoption of judicial estoppel would be out of harmony with the great weight of authority independent of that rule, and would discourage the determination of cases on the basis of the true facts as they might be established ultimately). Accordingly, this Court, using its discretion, declines to impose the doctrine of judicial estoppel. *See New Hampshire v. Maine,* 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

### 3. Dismissal of the Tort Counts for failure to state claim

The parties agree that Colorado law applies to the dismissal of the Torts Counts for failure to state claim.

#### a. Count XIV—aiding and abetting breach of duty

■ Under Colorado law, the tort of aiding and abetting a breach of duty requires that the following elements be met: (1) breach by a fiduciary of a duty owed to plaintiff, (2) defendant's *knowing* participation in the breach, and (3) damages. *See Holmes v. Young,* 885 P.2d 305, 308 (Colo.Ct.App.1994) (emphasis added).

■ The Underwriter Defendants take issue with the knowing requirement. They claim that Boston Chicken signed numerous documents verifying the "accuracy and integrity" of its financial status, as a condition of the Underwriters purchase, with each offering. The Underwriter Defendants maintain that they are victims of Boston Chicken's mismanagement. As such, they argue that as a matter of law, they could not have known about the misrepresentations and thus the *prima facie* case has not been met.

The Complaint, however, alleges that the Underwriter Defendants knew that the information provided by the Individual Defendants was false, and, further alleges that the Underwriter Defendants were participating in the scheme to further disseminate this information, to the detriment of the Company. While the Underwriter Defendants present compelling arguments as to what, if anything, they knew, based on the verified financial documents, it would be both premature and inappropriate for this Court to make such factual determinations.

#### b. Acting in concert

■ Five elements must be met under Colorado law in order to establish a civil conspiracy. *See Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486, 502 (Colo.1989). These five elements are: (1) two or more persons, and for this purpose a corporation is a person; (2) ·an object to be accomplished; (3) meeting of the minds on the object or course of action (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *See* id.

■ Similar to the above argument, the Underwriter Defendants essentially argue that because Boston Chicken verified the financial information provided, the Underwriter Defendants could not, as a

matter of law, have wrongfully conspired to injure the Company.

As discussed above however, the Complaint alleges the Underwriter Defendants knowingly participated in a scheme to commit tortious acts against the Company by taking information from the Individual Defendants knowing it to be false and misleading and placing their imprimatur on it, in furtherance of the scheme. As with the aiding and abetting argument, the Underwriter Defendants' argument here also, is based on factual, rather than legal insufficiencies in the Complaint.

### c. Negligence

█ "To recover on a claim for negligence, the plaintiff must establish the existence of a legal duty on the part of the defendants, breach of that duty by the defendant, causation, and damages." *Davenport v. Community Corrections,* 962 P.2d 963, 966 (Colo.1998).

█ The Underwriter Defendants claim that the *prima facie* case for negligence has not been met because the relationship between the parties arises out of a contract. Thus, the Underwriter Defendants claim that Colorado tort law permits tort claims only where the plaintiff can establish "[a] breach of a duty arising independently of any contract duties between the parties[.]" *Town of Alma v. Azco Construction, Inc.* 10 P.3d 1256, 1263 (Colo.2000). In making this argument, the Underwriter Defendants rely on the "economic loss rule", as adopted by the Colorado Supreme Court in *Town of Alma.* 10 P.3d at 1264. The economic loss rule states that the party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law. *See id.*

█ However, the Underwriter Defendants fail to acknowledge that professional negligence is one of those torts which are expressly designed to remedy pure economic loss. *See Town of Alma,* 10 P.3d at 1263; *see also Rian v. Imperial Mun. Serv. Group, Inc.* 768 P.2d 1260, 1263 (Colo.App.1988).

█ In Colorado, "for those practicing a profession requiring specialized knowledge or skill, reasonable care requires that actor to possess a standard of specialized knowledge or skill, reasonable care in a manner consistent with the knowledge and ability possessed by members of the profession in good standing." *Corcoran v. Sanner,* 854 P.2d 1376, 1379 (Colo.App. 1993). The Complaint makes the *prima facie* showing that the Underwriter Defendants failed to meet these professional standards and the Company's reasonable expectations.

### d. Negligent misrepresentation

The Restatement (Second) Torts § 552 governs Colorado claims for negligent misrepresentation. Section 552 provides as follows:

(1) One who, in the course of his business profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... the liability stated in subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it[.]

■ The Underwriter Defendants claim that the Trustee is unable to satisfy any of the required elements of § 552. As with their previous arguments, the Underwriter Defendants fail to recognize that the Complaint alleges Boston Chicken itself was a victim, in addition to the investing public.

Specifically, the Complaint alleges that, the Underwriter Defendants, "knew, or absent reckless disregard for the truth should have known, that the registration statement for [Boston Chicken's] IPO and the materially false misstated financial statements contained therein would be provided to the board of Directors, the Audit Committee, the creditors and the SEC." The Complaint makes similar allegations with respect to the Underwriter Defendants involvement in each of the offerings. The Complaint further alleges that each of the misrepresentations and omissions in those public offering documents related to the then-existing material facts were false and misleading, and were made by the Defendant Underwriters for financial gain, "expecting and realizing that the Board of Directors and Audit Committee would rely upon the misrepresentations and omissions." The Complaint also alleges that the Underwriter Defendants made these misrepresentations and omissions "for the purpose of inducing the Board of Directors and Audit Committee to rely upon them," and that the Board and Audit Committee were unaware of the false nature of those misrepresentations and/or omissions of material fact.

Based on the allegations set forth in the Complaint, this Court concludes that the Trustee has adequately set forth the nec-essary *prima facie* case for negligent misrepresentation.

### F. Bell, Boyd & Lloyd's Motion to Dismiss Counts I and II [5]

Defendant Bell, Boyd & Lloyd (hereinafter BB & L) move for an Order dismissing Count I (breach of fiduciary duty) and Count II (aiding and abetting breach of fiduciary duty) of the Trustee's Complaint. Despite BB & L's argument for the application of Illinois law, this Court will apply the relevant Colorado law for its analysis of these claims.

*1. Dismissal of breach of fiduciary duty and aiding and abetting breach of fiduciary duty for duplication*

In *Hanna v. Plumer*, the Supreme Court concluded that if there is a federal rule of procedure covering a particular point of practice or pleading in dispute, such rule governs in a federal diversity action even if resorting to state law would lead to a different result. 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *see also Santana v. Holiday Inns*, 686 F.2d 736, 740 (1982).

BB & L moves to dismiss the breach of fiduciary duty and aiding and abetting breach of fiduciary duty on the grounds that such claims, under Illinois law, are duplicative of the trustee's legal malpractice claim.

■ This argument is based on Illinois law, and the procedural aspects of this matter are governed by federal law. Federal Rule of Civil Procedure 8(e) permits

---

**5.** The Court notes that Trustee filed a separate Complaint against Bell, Boyd & Lloyd as they refused to enter into a tolling agreement like the other defendants. Accordingly, the Motion to Dismiss was filed under the bankruptcy action, then transferred to District Court under case number 01–CV–246–PHX–ECH.

The matter was originally before Judge Carroll but consolidated with the *Smith v. Arthur Andersen action*, 00–CV–218, before this Court. Accordingly, this Motion to Dismiss references the Complaint and Counts I and II filed in the 01–CV–246 matter.

the assertion of alternative claims. "A party may set forth two or more statements of a claim or defense alternatively or hypothetically..." Fed.R.Civ.P. 8(e). Clearly, the Trustee is permitted to make alternative allegations under federal civil procedure and dismissal is not warranted on this basis.

### 2. Aiding and abetting breach of fiduciary duty

BB & L also argue that Count II, aiding and abetting breach of fiduciary duty, should be dismissed because Illinois law does not recognize this claim. As stated above, this Court will use Colorado law for its analysis.

The Restatement (Second) of Torts § 876(b) states, "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Colorado follows Restatement § 876(b) and recognizes the claim for aiding and abetting a breach of fiduciary duty. *See Holmes v. Young*, 885 P.2d 305 (Colo.App.1994) (adopting Restatement (Second) of Torts § 876; recognizing aiding and abetting breach of fiduciary duty claim in a limited partnership situation); *see also Q.E.R. v. Hickerson*, 880 F.2d 1178 (10th Cir.1989) (finding that claim of aiding and abetting breach of fiduciary duty would be recognized in Colorado); *Alexander Co. v. Packard*, 754 P.2d 780, 782 (Colo.App.1988). Based on the foregoing the claims against BB & L will remain pending before this Court.

IT IS ORDERED that Arthur Andersen's Motion to Dismiss Counts VIII, IX, X, XI and XII (Doc. 44) is DENIED.

IT IS FURTHER ORDERED that Alex Brown/Deutsche Banc's Motion to Dismiss Counts XVIII and XIX (Doc. 51) is DENIED.

IT IS FURTHER ORDERED that the Motion to Dismiss filed by all defendants on statute of limitations grounds (Doc. 56) is DENIED.

IT IS FURTHER ORDERED that the Underwriter Defendants' Motion to Dismiss Counts XIV, XV, XVI and XVII (Doc. 57) is DENIED.

IT IS FURTHER ORDERED that the Individual Defendants' Motion to Dismiss (Doc. 58) is DENIED.

IT IS FURTHER ORDERED that Bell, Boyd & Lloyd's Motion to Dismiss is DENIED.